23 P.3d 744

STATE of Hawai'i, Plaintiff–Appellee,

v.

Victor Michael FERRER,
Defendant–Appellant.

No. 22654.

Intermediate Court of Appeals of Hawai'i.

March 30, 2001.

Reconsideration Denied May 24, 2001.

Timothy I. MacMaster, on the briefs, for defendant-appellant.

Bryan K. Sano, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE, and LIM, JJ.

Opinion of the Court by WATANABE, J.

Defendant–Appellant Victor Michael Ferrer (Defendant) appeals from the June 1, 1999 Judgment of the District Court of the First Circuit, 'Ewa Division (the district court), convicting him of Driving Under the Influence of Intoxicating Liquor (DUI), in violation of Hawai'i Revised Statutes (HRS) § 291–4 (Supp.1998).[1]

---

1. At the time that Defendant Appellant Victor Michael Ferrer (Defendant) was arrested on

Concluding that the record on appeal supports Defendant's conviction of DUI under HRS § 291-4(a)(2), we affirm.

### BACKGROUND

#### A. *The Traffic Stop*

The transcripts of the district court proceedings below indicate that on March 22, 1999, at approximately 12:05 a.m., Officer Alfred Chock (Officer Chock) of the Honolulu Police Department (HPD) "was running laser reports, speeding reports" at the corner of Farrington Highway and Kahuali'i Street in Waipahu when he observed Defendant's motorcycle "[c]oming down Farrington Highway west bound[.]" Officer Chock testified that he "initiated" Defendant's vehicle with an LTI 20-20 hand-held laser, which indicated that Defendant's vehicle was traveling at a speed of seventy-seven miles per hour. Officer Chock thereupon activated his "blue lights and sirens and pulled [Defendant] over and initiated a traffic stop."

According to Officer Chock, Defendant, who was not wearing a helmet, pulled over his motorcycle "right away" and produced, at Officer Chock's request, a driver's license, vehicle registration, and no-fault insurance card. After detecting a "moderate odor" of alcohol emanating from Defendant's breath and noticing that Defendant's eyes were red, "[h]is demeanor was kinda sluggish" and "[h]is verbal toneage was kinda slurred[,]" Officer Chock asked Defendant if "he wouldn't mind consenting to ... take any field sobriety test" (FST). According to Officer Chock, Defendant replied, "Yeah, sure. Okay."

On cross-examination, Officer Chock was asked about why he administered the FSTs to Defendant. The following colloquy transpired:

**Q** Okay. And let me ask you this: Why didn't you just arrest him before you did the [FST]?

**A** 'Cause all I had was speed.

**Q** Okay. Isn't it a fact that prior to the administration of the [FST] you did not have sufficient probable cause to arrest [Defendant] for [DUI]—

**A** Prior to, no.

. . . .

**Q** Consider everything that you observed right up until the point in time at which you started to administer the [FST]—let's back up. One of the reasons that you administered the [FST] is to determine whether or not someone is under the influence of intoxicating liquor, correct?

**A** Yes.

. . . .

**Q** Okay. And so isn't it a fact that prior to the administration of the [FST], you did not have sufficient probable cause to arrest [Defendant] for [DUI].

**A** That's why we do the test.

**Q** Okay. And you're agreeing that you did not have a sufficient probable cause to arrest [Defendant] until you administered the test and evaluated his performance on it, correct?

**A** I did not have enough to—I just wanted to see if he was capable of driving (inaudible).

**Q** Okay. And so because you did not have sufficient probable cause at that time, you administered the [FST], correct?

**A** Or I took the (inaudible) his red eyes, the moderate odor of alcohol, maybe his speed into account. That's why I asked him to take the test.

**Q** Okay. And actually, actually to the extent to which his speech was slurred,

March 22, 1999, Hawai'i Revised Statutes (HRS) § 291-4 (Supp.1998) provided, in pertinent part:

**Driving under the influence of intoxicating liquor.** (a) A person commits the offense of driving under the influence of intoxicating liquor if:

(1) The person operates or assumes actual physical control of the operation of any vehicle while under the influence of intoxicating liquor, meaning that the person concerned is

under the influence of intoxicating liquor in an amount sufficient to impair the person's normal mental faculties or ability to care for oneself and guard against casualty; or

(2) The person operates or assumes actual physical control of the operation of any vehicle with .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood or .08 or more grams of alcohol per two hundred ten liters of breath.

that was something that you had had some opportunity to detect prior to the administration of the test—

**A** Yes.

. . . .

**Q** Okay. Considering—just to be real clear on this—considering the 77-mile-per-hour speed that he was driving; considering the extent to which you believed his speech was slurred, considering the red eyes that you had observed and then considering the moderate odor of an alcoholic beverage that you had detected on his breath, up until that point, the totality of those circumstances did not give you probable cause to arrest [Defendant]. That's why you had to go ahead and do the FST to get more facts that could support probable cause, correct?

**A** Yes.

### B. *The Administration of the FSTs*

Officer Chock testified that the three FSTs he administered were the horizontal gaze nystagmus (HGN) test,[2] the one-leg-stand, and the walk-and-turn. Before administering the tests, he asked Defendant a number of preliminary questions, including whether Defendant was on any medication, under the care of a doctor, had a glass eye, or was epileptic or diabetic. Defendant informed Officer Chock that he was on medication but answered negatively to the remaining questions.[3]

### 1. *The HGN Test*

Officer Chock related that the first FST he administered to Defendant was the HGN test. Officer Chock had been trained by "certified" instructors at the police academy to administer the HGN test and had given the test numerous times. At the time of his HGN training, the "instructors were part of the solo bike, the motorcycle police officers. They came out and since they always do the test so often, they come out and the certified

---

**2.** In *State v. Ito*, 90 Hawai'i 225, 978 P.2d 191 (1999), this court explained:

> Nystagmus is a well-known physiological phenomenon that has been defined by one medical dictionary as "an involuntary rapid movement of the eyeball, which may be horizontal, vertical, rotatory, or mixed, i.e., of two varieties." [Horizontal gaze nystagmus (HGN) ] or jerk nystagmus is a particular type of nystagmus "characterized by a slow drift, usually away from the direction of gaze, followed by a quick jerk or recovery in the direction of gaze." Stated otherwise, it "is the inability of the eyes to maintain visual fixation as they are turned from side to side."
>
> . . . .
>
> The HGN test
> is based on the observation of three different physical manifestations which occur when a person is under the influence of alcohol: (1) the inability of a person to follow, visually, in a smooth way, an object that is moved laterally in front of the person's eyes; (2) the inability to retain focus and the likelihood of jerking of the eyeball when a person has moved his or her eye to the extreme range of peripheral vision; and (3) the reported observation that this "jerking" of the eyeball begins before the eye has moved 45 degrees from forward gaze if the individual's BAC (Blood Alcohol Content) is .10 percent or higher.
> The only equipment needed to administer the HGN test is a stimulus, such as a pen, penlight, or the officer's finger. The stimulus is positioned about twelve to fifteen inches in front of a suspect's eyes. As the officer gradually moves the stimulus towards the suspect's ear and out of the suspect's field of vision, the officer observes the suspect's eyeballs to detect three signs of intoxication: an angle of onset of nystagmus (measured from the suspect's nose) of forty-five degrees or less; distinct or pronounced nystagmus at the eye's maximum horizontal deviation; and the inability of the eyes to smoothly pursue the stimulus.

*Id.* at 230–31, 978 P.2d at 196–97 (brackets and citations omitted).

**3.** Before the deputy prosecuting attorney (the DPA) could question Officer Alfred Chock (Officer Chock) of the Honolulu Police Department (HPD) about Defendant's performance on the HGN test, defense counsel entered an objection on the grounds that Officer Chock had not testified regarding the significance of Defendant's admission that he was on medication. Officer Chock thereafter explained that certain drugs affect a person's performance on the HGN test. Although unable to recall what type of medication Defendant asserted that he took, Officer Chock testified that if it had been a drug that he was aware would affect the results of the HGN test, he would not have administered the test to Defendant. Because the District Court of the First Circuit (the district court) concluded that the questions regarding the medication were preliminary foundational questions, the district court allowed Officer Chock to proceed with his testimony regarding Defendant's performance on the HGN test.

instructors come out and teach us, not the instructors (inaudible) that we've had."

. Regarding the nature of his training to administer the HGN test, Officer Chock explained:

> When we were at the [police] academy, the course we went through instruction, classroom time, going over each one of the tests. And then they brought in subjects, volunteers to basically drink and get them inebriated, you know, certain levels and certain body types. And some of them would have eaten, some of them would have been on an empty stomach.

> Then we perform tests. There are (inaudible) tests on these individuals and then we would say yes or no if they did not or if they did pass; and then they would focus on how well you did as far as your gaging [sic] if he passed or failed that test that certain person. There's like over a dozen people there. So we all got a chance to do each one of them.

> Some of the test subjects were, they were cold sober, but acting in a, a drunken fashion, you know. But some of them were, they had plenty to drink and they were not able to drive.

Officer Chock further testified that the instructors went over the results of the testing with him and would have informed him had he not performed well. Officer Chock related that he completed one full day of training and additionally "might have had fringe training," which he defined as "four hours here, four hours there." He asserted that he had also performed actual HGN tests on the road. According to Officer Chock, he did not get a "piece of paper" certifying that he was authorized to administer the HGN test. His certification "just means that [he is] able to recognize what gives [him] the probable cause to think that this person who was driving or had been driving might be under the influence of alcohol."

Over Defendant's objection that proper foundation had not been laid for the admission of Officer Chock's testimony, Officer Chock described Defendant's performance on

the HGN test. Officer Chock related that in administering the first part of the HGN test,

> we would have [Defendant] focus on a fixed object in front of [his] face a little bit above the eye. We would of course have a flashlight which (inaudible) have a better view (inaudible).

> We would first of all go slowly to the right, (inaudible) go slowly to the right and see if the eyes track the fixed object that I hold in front of his face. Okay. Then I bring it back to center. Okay. . . .

In his opinion, Officer Chock testified, Defendant failed this part of the test because "[h]is eyes did not track smoothly."

Officer Chock explained that the second portion of the HGN test is nystagmus[4] at maximum deviation.

> We take the same test, held an object which he can see and, you know, shiny object or something, above his—in front of his face about six to eight inches, a little bit above the eyes and then we take his eyes all the way to as far as he could see without moving his head.

> Then we leave it there for a couple of seconds so we can see the maximum—and if there's any nystagmus at that maximum deviation, then all the way either to the right or to the left.

Officer Chock opined, over defense counsel's objection, that Defendant failed this part of the test because "the eye was twitching at maximum deviation." Officer Chock explained that, in his view, an individual would "pass" the second portion of the HGN test if "at maximum deviation . . . basically the eyeball is still."

Officer Chock then stated that the third part of the HGN test involves

> start[ing] off from the same position as we did, four to eight inches in front of the person's eyes having his head (indiscernible). What we do is we raise the object above [the person's] head about six inches or however high he can look up and we track it going back down.

---

**4.** Officer Chock defined "nystagmus" as "when the . . . dark part of [the] eye either starts jump-
ing or twitching[.]"

Officer Chock explained the grading of this portion of the test as follows:

> There would be subject or [Defendant] tracked it smoothly going up or he wouldn't track it at all going up and then he tracks it going back down instead of if the eyeball just comes straight down, judging from up to down, then that would lead what you'd call a fail. If he tracks smoothly going back down, then basically he would pass.

On this portion of the test, Officer Chock noted that he "did not see anything out of the ordinary other than just tracking." However, his total evaluation of Defendant's overall performance was that Defendant failed the HGN test.

Officer Chock never mentioned testing Defendant to determine the angle of onset of nystagmus.

### 2. *The One Leg Stand Test*

Officer Chock testified that he administered to Defendant the one-leg-stand FST. Officer Chock explained that he was certified to administer this test, as well as the other FSTs, through the same instruction that he had received for the HGN test. With respect to the one-leg-stand test, Officer Chock explained that

> we would tell them to place their hands, usually down at the sides, to relax, okay. We would try to-for them to look straight ahead. Then we would perform the test by raising whichever leg they felt comfortable raising six inches, six inches above the ground with their toes faced pointing forward and their knee not bent and count up to the thirty using the method of counting one one-thousand, two one-thousand, three one-thousand, so on.

Officer Chock testified that he explained and demonstrated the test for Defendant in its entirety, and Defendant asserted that he understood how to perform the test.

Officer Chock mentioned that in evaluating performance on this test, police officers are checking to see

> [i]f the test is completed too fast. We time the test to see how long it takes. If they go too fast, then of course the time of the

test would be shorter. If you go too long, then of course, and so on. But we have to look if he puts his foot down, if he's swaying, if he loses his balance, if he skips numbers, he raises his arms, he hops or he just can't complete the test or he does half of the test and he can't complete it 'cause he can't keep his balance.

Asked for his opinion of Defendant's performance on the one-leg-stand test, Officer Chock testified, over defense counsel's running objection to lack of foundation, that Defendant "failed" the test. Officer Chock explained that Defendant

> did the test too fast ... because he skipped several numbers. He didn't do the test the way I asked him to do, one one-thousand, two one-thousand. Instead he'd go one one-thousand, two one-thousand, then he'd go (inaudible) and then back ... [into] [r]egular numbers like one, two, three, four, five one-thousand, six one-thousand, seven-thousand, he would skip numbers. He would put his foot down and sway, raise his arms.

### 3. *The Walk–and–Turn Test*

Officer Chock testified that he also asked Defendant to perform the walk-and-turn test, in which "a person walks in a straight line for nine steps, does a pivot and walk [sic] back, just to see if he can walk in a straight line." After reiterating that he'd been trained to administer this FST at the police academy, by the same certified instructors who had trained him to administer the other FSTs, Officer Chock stated that he gave Defendant instructions and then a demonstration on how to complete the test. Further, Officer Chock asserted that Defendant indicated that he understood the instructions.

According to Officer Chock, while he was instructing Defendant on how to complete the walk-and-turn test, Defendant "basically was standing there and kind of lost his balance." In Officer Chock's opinion, Defendant "failed" the walk-and-turn test "[b]ecause he raised his arms and missed heel[-]to[-]toe. We also told him to count each step, you know, when they take each step and he missed heel[-]to[-]toe, not like we demonstrated." Additionally, Officer Chock

related, instead of pivoting on the turn, Defendant "just turned around and ... started again with the second foot."

Based on his "training as [an HPD] officer as well as [his] training through the academy," Officer Chock rated "[D]efendant's performance on the over-all [FST]" as a failure. Additionally, over defense counsel's objection, Officer Chock opined that Defendant's "speeding coupled with evaluation results of the test" led him to conclude that Defendant "was impaired" and "under the influence of alcohol." As a result, Officer Chock arrested Defendant for DUI and took Defendant to the Pearl City Police Station for processing.

### C. The Intoxilyzer Test

Officer Chock testified that upon arrival at the police station, he informed Defendant of Plaintiff–Appellee State of Hawai'i's (the State) Implied Consent Law,[5] using an HPD–396B form.[6] Although Defendant refused to sign the form, he did, according to Officer Chock, orally agree to submit to a breath test.

Officer Chock asserted that he performed the breath test using the Intoxilyzer Model 5000 instrument, serial No. 66–003552, on which he had received eight hours of training and was licensed as an operator by the Chief of Police for the City and County of Honolulu. Prior to administering the test, Officer Chock ran a self-diagnostic test on the instrument, which confirmed that it was operating properly. At the request of the deputy prosecuting attorney (the DPA), the district court took judicial notice that the Intoxilyzer Model 5000 was one of the "blood (sic) alcohol testing mechanisms" accepted as accurate to test blood alcohol pursuant to Hawai'i Administrative Rules (HAR) Title 11, chapter

---

**5.** At the time Defendant was arrested, the Hawai'i Implied Consent Law for non-commercial drivers of motor vehicles or mopeds was HRS § 286–151 (Supp.1998), which provided as follows:

**Implied consent of driver of motor vehicle or moped to submit to testing to determine alcohol concentration and drug content.** (a) Any person who operates a motor·vehicle or moped on the public highways of the State shall be deemed to have given consent, subject to this part, to a test or tests approved by the director of health of the person's breath, blood, or urine for the purpose of determining alcohol concentration or drug content of the person's breath, blood, or urine, as applicable.

(b) The test or tests shall be administered at the request of a police officer having probable cause to believe the person driving or in actual physical control of a motor vehicle or moped upon the public highways is under the influence of intoxicating liquor or drugs, or is under the age of twenty-one and has a measurable amount of alcohol concentration, only after:

(1) A lawful arrest; and
(2) The person has been informed by a police officer of the sanctions under part XIV and sections 286–151.5 and 286–157.3.

(c) If there is probable cause to believe that a person is in violation of section 291–4 or section 291–4.3, then the person shall have the option to take a breath or blood test, or both, for the purpose of determining the alcohol concentration.

(d) If there is probable cause to believe that a person is in violation of section 291–7, then the person shall have the option to take a blood or urine test, or both, for the purpose of deter-

mining the drug content. Drug content shall be measured by the presence of any scheduled drug as provided in section 291–7 or its metabolic products or both. The person shall be informed of the sanctions of section 286–157.3 for failure to take either test.

(e) A person who chooses to submit to a breath test under subsection (c) also may be requested to submit to a blood or urine test, if the officer has probable cause to believe that the person was driving under the influence of any drug under section 291–7 or the combined influence of alcohol and drugs and the officer has probable cause to believe that a blood or urine test will reveal evidence of the person being under the influence of drugs. The officer shall state in the officer's report the facts upon which that belief is based. The person shall have the option to take a blood or urine test, or both, for the purpose of determining the person's drug content. Results of a blood or urine test conducted to determine drug content also shall be admissible for the purpose of determining the person's alcohol content. Submission to testing for drugs under subsection (d) or this subsection shall not be a substitute for alcohol tests requested under subsection (c).

**6.** The record on appeal reveals that the HPD–396B form, entitled "ADMINISTRATIVE DRIVER'S LICENSE REVOCATION LAW," is meant to be read by police officers to Driving Under the Influence of Intoxicating Liquor (DUI) arrestees in order to inform the arrestees: that they "may take either a blood or a breath test or both"; of the consequences of their refusal to take either test; and of other consequences that might flow from their arrest.

114, subsection 5(a)(3), promulgated by the Hawai'i Department of Health. Officer Chock thereafter testified that the Intoxilyzer reading of Defendant's breath alcohol content was .164.

On cross-examination, Officer Chock clarified that although he is a duly licensed Intoxilyzer operator, he is not a licensed supervisor. The following colloquy then transpired:

[Defense Counsel]: Is there a duly licensed [I]ntoxilyzer supervisor who supervises your performance in breath tests?

[Officer Chock]: You mean, every individual with breath test?

[Defense Counsel]: Well, yeah, in every single—is there a duly licensed [I]ntoxilyzer supervisor who supervises every single breath test that you yourself conduct?

[Officer Chock]: He's not there right there behind me (indiscernible). There can be (indiscernible).

[Defense Counsel]: Okay. Well the HPD has a, a number of duly licensed [I]ntoxilyzer supervisors, correct?

[Officer Chock]: Yes.

. . . .

[Defense Counsel]: . . . . You are a duly licensed [I]ntoxilyzer operator, correct?

[Officer Chock]: Yes. . . . I administered the breath test (indiscernible).

[Defense Counsel]: No duly licensed [I]ntoxilyzer supervisor performed this breath test, correct?

[Officer Chock]: No.

[Defense Counsel]: Is there a duly licensed [I]ntoxilyzer supervisor who supervised the administration of this particular breath test on this particular occasion?

[Officer Chock]: No, he wasn't there that night.

Defense counsel then queried Officer Chock about Officer Chock's present recollection of Defendant's breath test results:

[Defense Counsel]: Okay. In your mind's eye, do you have a mental image of the readout on the digital display of the result for [Defendant's] breath test on this particular occasion?

[Officer Chock]: I needed my report in order to refresh my memory.

[Defense Counsel]: Okay. That's right. And because prior to coming to court to testify today, you didn't have a present recollection of what the result of [Defendant's] breath test was, correct?

[Officer Chock]: It was over .08.

[Defense Counsel]: You might have recalled that it was over .08, but you did not recall the exact number, correct?

[Officer Chock]: Not the exact number.

[Defense Counsel]: Okay. And so consequently, when you testified on the direct that the result of the breath test was a .164, that was based on remembering what you had recently read in your report and not based on a present recollection of what the actual—of what actually happened that night, correct?

[Officer Chock]: (Indiscernible) images in my mind today, oh yeah, (indiscernible).[7]

---

7. On September 16, 1999, Defendant filed in the district court, pursuant to Hawai'i Appellate Rules of Procedure (HRAP) Rule 10(c), a "Statement of the Evidence," submitting, based on his attorney's recollection of the testimony given by Officer Chock, that this response by Officer Chock be deleted and replaced with the following:

Based on any images in my mind today? Oh yeah, that was not based on any images in my mind of what happened that night.

HRAP Rule 10(c) provides, in part, that

[i]f the reporter refuses, becomes unable, or fails to transcribe all or any portion of the evidence or oral proceedings after proper request, the party may (i) request that transcription of the reporter's notes be submitted to another reporter for transcription where feasible; or (ii) *prepare a statement of the evidence or proceedings from the best available means, including the party's recollection* or uncertified transcripts or reporter's notes. The statement shall be served on the opposing party(ies), who may serve objections or propose amendments thereto within 10 days after service. *Thereupon the statement and any objections or proposed amendments shall be submitted to the court or agency appealed from for settlement and approval and as settled and approved shall be included by the clerk of the court appealed from in the record on appeal.*

(Emphases added.) Based on our review of the record, it does not appear that the district court ever settled and approved of Defendant's request to substitute Officer Chock's response.

[Defense Counsel]: Okay. But no one would expect that that's gonna happen. So when you gave that testimony on the direct that the result of the [I]ntoxilyzer test that night was .164, you did not have a present recollection of what the result of that test was and you were testifying truthfully about what you had recently read in your report, correct?

[Officer Chock]: That's what I knew I had written out.

(Footnote added.)

On redirect examination, the DPA asked the district court to admit into evidence the card on which Officer Chock had recorded the results of the Intoxilyzer test administered to Defendant.[8] Defense counsel objected and reminded the district court that it had sustained a previous objection to the admission of the card. The district court then asked Officer Chock a number of questions regarding his present recollection of the Intoxilyzer results:

THE COURT: ... when you wrote down the number that appeared on the screen of the breath testing device—

[Officer Chock]: Yes.

THE COURT:—was the number the number that appeared on the screen, the number that you wrote down on the report?

[Officer Chock]: Yes, it was.

THE COURT: Okay. And to your recollection, you, you after looking at your report, is it accurate that today as you testify that the number is the same as what you saw on the display of the machine that tested [Defendant's] breath?

[Officer Chock]: Yes, I believe it is.

The district court sustained the defense objection.

Thereafter, the DPA requested that the district court admit into evidence State's Exhibits "1" and "2," which were certified public documents of the Intoxilyzer Supervisor's Sworn Statement of Accuracy, dated March 16, 1999 and April 1, 1999, respectively, for Intoxilyzer Serial No. 66–003552. Over defense counsel's objection that the documents were hearsay, the district court admitted the documents into evidence on grounds that "they're preliminary matters as to the reliability of the device that was used to test the breath[.]" Following the admission of the documents, the State rested its case.

### D. *Motions to Strike and for Judgment of Acquittal*

Defense counsel thereafter moved for a judgment of acquittal as to both the speeding[9] and DUI charges. The district court

---

8. The DPA had attempted to introduce the card into evidence on direct examination. However, Defendant's counsel had objected, on grounds that

> [t]he document contains information that has been recorded about the (indiscernible) appearance and demeanor.
>
> The document contains a sworn statement that Officer Chock prepared on the night of the arrest that states, "I, Officer Chock, a qualified Intoxilyzer [Model] 5000 Operator, license number box has zero-three-five-six written in it; expiration date has 12–12–2000 written in it, swear that the following is true and correct" and then a number of statements. It also has that .164 written on it apparently by Officer Chock as well as signed by Officer Chock.
>
> Your Honor, it's a police report that was prepared during the course of a criminal case of a law enforcement investigation. In the good ole days, they used to have two separate documents. One would be the actual test card itself, one would [sic] the sworn statement—

The district court sustained Defendant's objection, stating: "Well he's already testified as to the reading. There's no need to introduce ... this in evidence."

9. Defense counsel argued that no proof had been offered as part of the State's case-in-chief that the thirty-mile-per-hour and thirty-five-mile-per-hour speed limit signs that Defendant had passed "were in fact official signs posted by the City and County of Honolulu." HRS § 291C–102 (1993), which prohibits noncompliance with speed limits, provides, in relevant part:

> (a) No person shall drive a vehicle at a speed greater than a maximum speed limit and no person shall drive a motor vehicle at a speed less than a maximum speed limit established by county ordinance.
>
> (b) The [state] director of transportation with respect to highways under the director's jurisdiction may place signs establishing maximum speed limits or minimum speed limits. Such signs shall be official signs and no person shall drive a vehicle at a speed greater than a maximum speed limit and no person shall drive a motor vehicle at a speed limit less than a minimum speed limit stated on such signs.

granted the motion as to the speeding charge.

Defense counsel then argued that, without the speeding charge, "there's no other evidence at this point from which the [c]ourt could reasonably infer that there was reasonable suspicion for a motor vehicle stop in this case." Defense counsel therefore requested that all evidence obtained as a result of the vehicular stop be stricken and a judgment of acquittal as to the DUI charge be entered. The district court ruled, however, that "there is reasonable suspicion .... [m]aybe not a proof beyond a reasonable doubt as a—of a substantive charge, but there's probable cause here ."

Defense counsel then moved to strike all of the FST evidence "with respect to any determination on the issue of guilt or innocence on the DUI charge, as well as, as a separate motion, ... to strike all of the [FST] ... evidence with respect to the issue of whether or not there was probable cause for the arrest." Defense counsel also moved

> to strike all of the evidence obtained as a result of the arrest in this case on the grounds that there was not probable cause for the arrest and in particular we ask the [c]ourt to strike all of the breath test evidence on those grounds.
>
> Respectfully submit that improper foundation was layed [sic] for the admission of any [FST] evidence in this case. There was not proper testimony that [Officer Chock] was properly trained to administer [those tests].
>
> . . . .
>
> .... Motion is to strike all of the, all of the HGN evidence on the grounds that there was no foundation layed [sic] for that evidence. There was not sufficient evidence to show that [Officer Chock] was one, trained how to administer the test in accordance with the [National Highway Traffic Safety Administration (NHTSA) ] standards; and two, there was not sufficient evidence layed [sic] to show that [Officer Chock] did in fact administer the test in accordance with the NHTSA standards.
>
> . . . .

> .... And similar, just to be clear for the record, same arguments with respect to the walk-and-turn test—

The district court denied the foregoing motions to strike.

At that point, defense counsel moved, on two grounds, "to strike from the evidentiary record all evidence of the [I]ntoxilyzer test result in this case."

> One is that [Officer Chock's] testimony was not based on sufficient present recollection for him to be competent to testify about the result of the breath test. He quite candidly admitted that he gives a lot of breath tests. And it really would be unreasonable to expect—well, I'm not gonna say it's unreasonable, but it's—that somebody who gives so many breath tests would remember every single breath test and it doesn't matter whether he can remember every single breath test. . . .
>
> . . . .
>
> .... Last but not least, there was no evidence admitted as part of the prosecution's case-in-chief that would show that there was—that could support an [HRS § 291–4(a)(2) ] alternative method of proof in this case.
>
> Specifically what the statute requires is that you have to have evidence of a breath alcohol concentration in excess of 200—in excess of .08 grams of alcohol per 210 liters of breath.
>
> Testimony that there was the result of the test was a .164. There was no testimony whatsoever that the [I]ntoxilyzer in any way, shape or form correlates a .164 reading to any particular quantity of grams of alcohol per liters of breath. Grams is a measure of weight. Liters is a measure of volume.
>
> There was not testimony whatsoever—I mean, the testimony was that the result was .164, but sitting in a vacuum by itself and there was no request on the part of the prosecution to take judicial notice of the [I]ntoxilyzer being a device that reports numerically a relationship between grams of alcohol and liters of breath. Grams is a measure of weight. Liters is a measure of quantity.

. . . .

The motion, the motion is that is essentially a motion for judgment of acquittal with respect to any type of an [HRS § 291–4(a)(2) ] alternative method of proving the charge of driving under the influence, that you can't—bottom line is this: breath test evidence is out of this case. He didn't have present recollection and there wasn't sufficient correlation of weight to volume.

So what are you left with in terms of trying to prove the DUI case beyond a reasonable doubt? You're left with the testimony about appearance and demeanor. And I guess if you take the field sobriety stuff over the objections, that that [sic] might give you enough to deny a motion, you know, in a light most favorable to the State. That's certainly enough to deny my motion.

But I respectfully ask if you consider the whole thing with all the problems that the State has with all the different aspects of the case, acquittal is really warranted at this point.

The district court denied the foregoing motion.

Defense counsel then moved for a judgment of acquittal and to strike the breath test results on the following ground:

[HAR] Title 11[, c]hapter 114[,] sub-section 9 governing alcohol testing supervisors explicitly states supervisors of breath alcohol testing instrument shall be responsible for—sub-section 4 states "performing or supervising or both, breath alcohol tests."

Sub-section 8 states, "ensuring that the operators and instruments in the supervisor's charge adhere to the provisions of this sub-chapter."

Testimony of [Officer Chock] was that he's a duly licensed [I]ntoxilyzer operator. He is not a duly licensed [I]ntoxilyzer supervisor. The evidence showed that the test was administered or was, quote, performed by an [Intoxilyzer] operator, but it was not performed by an alcohol testing supervisor.

Sub-section 4 explicitly requires that an alcohol testing supervisor must perform or supervise the test. Therefore, since it wasn't performed by a supervisor, it had to have been supervised by a supervisor.

Have you ever wondered why they call these people [I]ntoxilyzer supervisors? Why don't they just call them [I]ntoxilyzer accuracy verification testers? And the reason is as even the name itself suggests, that some type of supervision must be carried on.

Well, his testimony was that no supervisor had supervised this particular test on this particular occasion and so the State—the burden of proof is on the State to show that there was at the very least substantial compliance with the requirements of Title 11[, c]hapter 114.

In this particular case, there's no evidence that a duly licensed [I]ntoxilyzer supervisor either performed or supervised the breath test at issue. And for that reason, it's out.

One last—also ensuring that the operators and instruments and the supervisors charge adhere to the provisions of this sub-chapter. There is apparently no one who supervised this particular—

The district court similarly denied the foregoing motion.

Defense counsel's final motion to strike the Intoxilyzer test results was premised on the following argument:

Your Honor, with respect that when [the DPA] was making his offer, trying to say what the [I]ntoxilyzer machine is that it's-what he should have said was breath alcohol testing device. That it's a breath—actually what he should have said it's a breath alcohol testing instrument. He kept saying "blood" alcohol testing instrument.

And so respectfully submit that to the extent to which the [c]ourt took judicial notice of the fact that it was a blood alcohol testing instrument, there's been no evidence in their case-in-chief to show that it was a breath alcohol testing instrument approved through the use in the State of Hawaii [Hawai'i] and on those grounds ask to have the breath test results suppressed

and then ask for judgment of acquittal as well.

This motion was denied as well.

Defendant thereupon exercised his right to refrain from testifying and was advised by the district court of his right, under *Tachibana v. State*, 79 Hawai'i 226, 236, 900 P.2d 1293, 1303 (1995), to testify. Defense counsel then requested the district court

> to take judicial notice of the 1984, the requirements regarding the administration and interpretation of [HGN] tests, walk-and-turn test and one-leg-stand test as set forth in the 1984 NHTSA Manual, the result of exhaustive research studies, and the 1995 NHTSA Student Manual.

After the district court granted the foregoing motion, Defendant rested his case.

### E. *The District Court's Decision*

The district court then orally announced its decision:

> All right. *The [c]ourt does find that the factors that lead the [c]ourt to believe that [Defendant] was [DUI] in an amount sufficient to impair his normal mental faculties or ability to care for himself and guard against casualty.*
>
> Where [sic] that his speed on the motorcycle was in excess of the speed that was posted, that the—his eyes were red, that the alcohol odor on his breath indicated some alcoholic consumption, the demeanor of his was slow and his speech slurred. His performance on the [FSTs] were all failures according to the opinion of [Officer Chock] who administered those tests.
>
> And *therefore the [c]ourt is going to find [Defendant] guilty of [DUI].* The [c]ourt does *not* find that the breath test was administered [10] and *the testimony came in*

> *beyond a reasonable doubt that he was driving under the influence while blood (sic)[11] alcohol was above .08. So the [c]ourt does find [Defendant] guilty as charged.*

(Emphases and footnotes added.)

The district court subsequently addressed defense counsel's arguments that Defendant should receive the minimum fines and should not be penalized for going to trial since he "has a right to go to trial," as follows:

> [Defendant] does have a right to have trial, but in insisting on a trial with a .164 reading, even though as flat as you may indicate that it might be, *the [c]ourt does find that the test was administered properly.*
>
> *The test was given, the supervisor's test of the machinery, the operator was experienced. A reading of 1.64(sic) just shows the [c]ourt that there is no responsibility taken on behalf of [Defendant], that he was driving actually with alcohol in his blood and breath and that he was under the influence.*
>
> And the [c]ourt, in going to trial with those facts, the [c]ourt—it seems is indicating to the [c]ourt that [Defendant] does not take responsibility for actually having done that. It's a dangerous thing to do and the [c]ourt is gonna penalize you accordingly.

(Emphases added.) The district court fined Defendant $500 and ordered him to undergo fourteen hours of alcohol treatment and to have an alcohol assessment done. Additionally, the district court suspended Defendant's license for ninety days, thirty days of which were absolute, and the remaining sixty days of which were conditional, with Defendant being allowed to drive during that conditional period to and from work, for work-related

---

10. The first part of this compound sentence is a bit confusing, since the record is undisputed that a breath test was administered to Defendant. Also, the district court specifically found, in the second part of this compound sentence, that "the testimony came in beyond a reasonable doubt that [Defendant] was driving under the influence while blood (sic) alcohol was above .08," and later, during sentencing, the district court noted Defendant's .164 Intoxilyzer test result and expressly found that "the test was administered properly." It seems clear to us, therefore, that the district court probably used the word "improperly" after the word "administered" in the first part of the compound sentence, so that the transcript should have read: "The [c]ourt does not find that the breath test was administered improperly. . . ."

11. It appears that the court reporter added "(sic)" to this part of the transcripts to indicate that although the district court said "blood," it should have said "breath."

purposes, and to and from alcohol treatment class.

When the district court's ruling is considered in its entirety, therefore, it appears, contrary to the State's apparent concession,[12] that the district court found Defendant guilty of DUI under either HRS § 291–4(a)(1), which requires a finding that Defendant operated or assumed actual physical control of the operation of a vehicle while "under the influence of intoxicating liquor in an amount sufficient to impair [Defendant's] normal mental faculties or ability to care for [himself] and guard against casualty," or HRS § 291–4(a)(2), which requires a finding that Defendant operated or assumed actual physical control of a vehicle "with .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood or .08 or more grams of alcohol per two hundred ten liters of breath."

This appeal followed.

## ISSUES ON APPEAL

Defendant's arguments on appeal essentially boil down to the following issues:

First, the district court reversibly erred in admitting, without proper foundation, Officer Chock's testimony about Defendant's performance on the FSTs.

Second, the district court erred in allowing Officer Chock to give opinion testimony that Defendant had failed (1) two phases of the

HGN test, (2) the HGN test as a whole, (3) the one-leg-stand test, (4) the first nine steps of the walk-and-turn test, and (5) the FSTs overall.

Third, the district court erred in denying his motion to strike the results of the Intoxilyzer Model 5000 breath test administered to Defendant because (1) Officer Chock did not have sufficient present recollection to be competent to testify about the result of the breath test, (2) there was no testimony that the Intoxilyzer reading correlated to a particular quantity of grams of alcohol per liter of breath, and (3) the State did not comply with the requirements of HAR §§ 11–114–4 and 11–114–9 [13] regarding alcohol testing supervisors.

Finally, the district court erred in improperly taking judicial notice that the Intoxilyzer Model 5000 is accepted as accurate to test for blood alcohol content.

## STANDARDS OF REVIEW

### A. *Evidentiary Rulings*

The Hawai'i Supreme Court has explained that "[e]videntiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *State v. Ortiz*, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999). Of particu-

**12.** In its answering brief, Plaintiff Appellee State of Hawai'i (the State) states that

> [t]here is ambiguity in the record as to whether or not the trial court even found Defendant guilty under the [HRS § 291–4]**(a)(2)** count. As the trial court apparently did not find Defendant guilty under [HRS § 291–4] **(a)(2),** any issue of insufficient foundation for the breath test result is moot. Thus, the State will only focus on the impairment evidence and not the breath test evidence. Because the evidence is sufficient with regard to the [HRS § 291–4] **(a)(1)** count, it is unnecessary to resolve the ambiguity in the trial court's ruling.

(Emphases in original.)

**13.** Hawai'i Administrative Rules (HAR) § 11–114–4 provides that a "supervisor" is "a person who supervises operators of breath alcohol testing instruments and meets the requirements of section 11–114–9." HAR § 11–114–9 provides, in part:

*Supervisors.*·(a) Supervisors of breath alcohol testing instruments shall be responsible for:

(1) The care of breath alcohol testing instruments;

(2) Insuring that instruments are maintained;

(3) Performing accuracy tests required by section 11–114–7;

(4) Performing or supervising, or both, breath alcohol tests;

(5) Reporting results of alcohol breath tests to appropriate governmental agencies as required by section 11–114–11;

(6) Keeping records as required by section 11–114–12;

(7) Training operators when required; and

(8) Insuring that the operators and instruments in the supervisor's charge adhere to the provisions of this subchapter.

(b) No person shall serve as a supervisor without a valid license issued by the DUI coordinator or the chief of police.

lar relevance to the instant case is the supreme court's holding that the

> admission of opinion testimony is a matter within the discretion of the trial court, and only an abuse of that discretion can result in reversal. Generally, to constitute an abuse of discretion, it must appear that the trial court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*State v. Toyomura*, 80 Hawai'i 8, 23–24, 904 P.2d 893, 908–09 (1995) (brackets, citations, and quotation marks omitted).

### B. *Denial of Motion for Judgment of Acquittal*

The supreme court has explained that in reviewing a post-verdict motion for judgment of acquittal,

> we employ the same standard that the trial court applies to such a motion, namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged. Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.

*State v. Timoteo*, 87 Hawai'i 108, 112–13, 952 P.2d 865, 869–70 (1997).

### C. *Construction of Hawai'i Administrative Rules*

This court has explained that

> the general principles of construction which apply to statutes also apply to administrative rules. As in statutory construction, courts look first at an administrative rule's language. If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning.

*Keanini v. Akiba*, 84 Hawai'i 407, 412–13, 935 P.2d 122, 127–28 (App.1997) (quoting *International Brotherhood of Electrical Workers, Local 1357 v. Hawaiian Tel. Co.*, 68 Haw. 316, 323, 713 P.2d 943, 950 (1986) (citations omitted)).

## DISCUSSION

### A. *The Foundational Requirements for Admission of Evidence Regarding Defendant's Performance on the FSTs*

Defendant contends that the district court erred when it admitted, without proper foundation, Officer Chock's testimony about Defendant's performance on the various FSTs. We agree that the proper foundational requirements were not met to allow Officer Chock to testify about Defendant's performance on the HGN test. We disagree that Officer Chock was precluded from testifying about Defendant's performance on the non-HGN FSTs, but we agree that Officer Chock should not have been allowed to express his opinion as to whether Defendant passed or failed these tests.

#### 1. *The HGN Evidence*

In *State v. Ito*, 90 Hawai'i 225, 241, 978 P.2d 191, 207 (App.1999), this court was called upon to determine what constitutes the proper foundation for HGN test results to be admitted as evidence of probable cause to arrest a person for DUI. We noted that the vast majority of courts that have considered the issue have concluded that HGN testing is based on a scientific principle not generally known by lay jurors. *Id.* at 233–34, 978 P.2d at 199–200. Due to the scientific nature of the HGN test, some of these courts will not admit HGN test results into evidence unless expert testimony is first adduced to demonstrate the reliability and acceptability of the test, or an appellate court has recognized the scientific validity of HGN testing. *Id.* Other courts, on the other hand, have taken judicial

notice that "the HGN test is a reliable and accepted indicator of intoxication" and have held HGN test results to be "admissible without further expert testimony as to the scientific validity and reliability of HGN testing, as long as proper foundation as to the techniques used and the police officer's training, experience, and ability to administer the test has been laid." *Id.* at 234, 978 P.2d at 200.

After reviewing the case law across the country and examining our own evidentiary rules and case law, we decided that "HGN test results have been sufficiently established to be reliable and are therefore admissible as evidence that police had probable cause to believe that a defendant was DUI." *Id.* at 241, 978 P.2d at 207. However, we also explained that

> [b]efore HGN test results can be admitted into evidence in a particular case, ... it must be shown that (1) the officer administering the test was duly qualified to conduct the test and grade the test results, and (2) the test was performed properly in the instant case.

*Id.* at 244, 978 P.2d at 210 (citation omitted). Since the issue was not presented, we did not decide whether HGN test results were admissible at trial as substantive evidence of a defendant's intoxication, although we noted that the vast majority of courts hold that HGN test results are not admissible to establish defendant's BAC. *Id.* at 233, 978 P.2d 191, 978 P.2d at 199.

The officer in *Ito* testified that he had received "standard training" from HPD to conduct the HGN test and grade the test results, and the district court "assumed that the standard training from HPD is ... sufficient" and that the officer "has in fact been qualified to give the test." *Id.* (brackets omitted). We concluded, however, that this was insufficient foundation to establish that the officer was qualified to conduct the test and grade the results because

> it is not clear what HPD's "standard training" consists of and whether HPD's standard training program meets the requirements of the NHTSA. Therefore, we have no way of knowing the extent and nature of [the officer's] HGN training, whether

[the officer's] training was supervised by certified instructors, whether [the officer] was certified to administer the test, and whether [the officer] received periodic retraining to refresh himself on his HGN test administration skills. Furthermore, the fact that [the officer] readily admitted that he does not usually check for the angle of onset of nystagmus while administering the HGN test and did not do so in this case suggests that his training may be suspect.

> The record also indicates that the HGN test may have been administered improperly in the instant case. Indeed, the district court acknowledged that [the officer's] administration of the test may have been "incomplete" because he only performed two parts of the three-part HGN test.

*Id.* (footnote omitted).

In *State v. Mitchell,* 94 Hawai'i 388, 15 P.3d 314 (App.2000), this court once again addressed the issue of whether an officer was duly qualified to conduct the HGN test and grade the results. In *Mitchell,* the arresting officer testified that he had received training in the administration of the HGN test in a "DUI class" from a "certified DUI instructor" with the patrol. *Id.* at 392, 15 P.3d at 318. We explained that the foundation was insufficient because

> [t]he State did not ... elicit any testimony as to whether the training [the officer] received meets the requirements of the NHTSA. [The officer] did not explain the nature and extent of the training except to say that the HGN training is part of the HPD DUI class taught by a certified instructor. [The officer] did explain the standardized clues he looks for as indicators of HGN; however, he did not testify that he was certified to administer the HGN test, or that he received periodic retraining to refresh himself on his HGN test administration skills.

*Id.* at 398, 15 P.3d at 324. Accordingly, we concluded that the State failed to establish proper foundation for the officer's testimony.

In this case, the testimony regarding Defendant's performance on the HGN test was

admitted as substantive evidence at Defendant's trial, rather than at a probable cause hearing. Officer Chock testified that he had been trained by certified instructors to administer the HGN test, and he had received certification himself, meaning that he is "able to recognize what gives [him] the probable cause to think this person who was driving or had been driving might be under the influence of alcohol." He also described the certification process that he underwent and explained that the instructors went over the results of the testing with him. He further testified that in addition to the full day of training he received, he also *possibly* received "fringe training" of "four hours here, four hours there." (Emphasis added.)

█ Even if HGN test results are admissible as substantive evidence of intoxication at a DUI trial, we conclude that the foregoing foundation was insufficient to establish that Officer Chock was duly qualified to conduct the HGN test and grade the test results. As in *Ito* and *Mitchell*, the State failed to elicit testimony from the officer that the training he received met the requirements of the NHTSA. Moreover, although Officer Chock testified that he went through the "complete training program," he was unsure whether he had received periodic retraining to refresh himself on the HGN test administration skills. In *Ito*, we explained that pursuant to the *1984 NHTSA Instruction Manual*, officers are required to "[p]ractice until you can consistently estimate 45 degrees. Check yourself *monthly* with [an 8″ × 15″ square template or cardboard with a diagonal line drawn from one corner to another to demark 45 degrees] to be sure that your accuracy has been sustained." *Ito*, 90 Hawai'i at 244 n. 10, 978 P.2d at 210 n. 10 (quoting *1984 NHTSA Instruction Manual*, reprinted in 1 *Defense of Drunk Driving Cases* § 10.99[2], app. at 10–92 (emphasis added)).

Moreover, the record indicates that Officer Chock improperly administered the test. In emphasizing the importance of following the established testing procedures, the NHTSA explained:

> [The validation of the FST results] applies *ONLY* **WHEN THE TESTS ARE ADMINISTERED IN THE PRESCRIBED, STANDARDIZED MANNER; AND** *ONLY* **WHEN THE STANDARDIZED CLUES ARE USED TO ASSESS THE SUSPECTS PERFORMANCE; AND** *ONLY* **WHEN THE STANDARDIZED CRITERIA ARE USED TO INTERPRET THAT PERFORMANCE.**
>
> **IF ANY ONE OF THE STANDARDIZED [FST] ELEMENTS IS CHANGED, THE VALIDITY IS COMPROMISED.**

*1995 NHTSA Student Manual, reprinted in part in* 1 *Defense of Drunk Driving Cases* § 10.06[5], at 10–27 (emphasis in original).

Officer Chock testified that while he was testing Defendant for nystagmus at maximum deviation, he held the stimulus in front of Defendant's face, about six to eight inches away. However, pursuant to the *NHTSA Student Manual*, an officer administering this portion of the test is instructed to "[p]osition the stimulus approximately 12–15 inches from the suspect's nose and slightly above eye level." *Id.* at 10–28. Because the administration of this HGN test was not in conformance with NHTSA standards, we cannot extend the scientific validity of the test results we accepted in *Ito* to the test administered in the instant case.[14]

Moreover, as in *Ito*, Officer Chock did not administer the angle of onset of nystagmus segment of the HGN test. Instead, he examined whether Defendant was able to smoothly track an object placed about four to eight inches in front of his eyes, as the object was

---

**14.** In concluding that the scientific principles underlying the HGN test were sufficiently established to be reliable evidence of probable cause for a DUI arrest, we considered, *inter alia*, whether there existed standards for the administration of the test. *Ito*, 90 Hawai'i at 238, 978 P.2d at 204. We explained that "[t]he *1984 NHTSA Instruction Manual*, the result of exhaustive research studies, sets forth the applicable standards governing the administration and scoring of the HGN test." *Id.*, quoting *1984 NHTSA Instruction Manual, reprinted in* 1 *Defense of Drunk Driving Cases* § 10.99[2], app. at 10–90 to 10–98. Accordingly, by failing to comport with the standards thus set forth, the validity we recognized in *Ito* is inapposite to the instant case.

raised above Defendant's head, and then back down.[15]

In the absence of foundational testimony establishing conformity to the NHTSA training standards, we conclude that the district court abused its discretion when it allowed Officer Chock to testify about Defendant's performance on the HGN test.

### 2. Admissibility of Evidence as to Defendant's Performance on the Non–HGN FSTs

At trial below, Defendant's counsel repeatedly objected to any testimony by Officer Chock regarding Defendant's performance on the one-leg-stand and walk-and-turn (hereafter "psychomotor FSTs"). Defense counsel argued that the proper *Ito* and *Toyomura* foundation had not been laid to allow Officer Chock to testify about Defendant's performance on these FSTs, and, therefore, all FST evidence with respect to any determination of guilt on the DUI charge, as well as for any determination of probable cause to arrest, should be stricken.

It is generally recognized, however, that the foundational requirements for admission of psychomotor FST evidence differ from the foundational requirements for admission of HGN evidence. *State v. Meador*, 674 So.2d 826, 831 (Fla.Dist.Ct.App.1996). Psychomotor FSTs

> test balancing and divided attention, or the ability to perform multiple tasks simultaneously.[16] While balancing is not necessarily a factor in driving, the lack of balance is an indicator that there may be

other problems. Poor divided attention skills relate directly to a driver's exercise of judgment and ability to respond to the numerous stimuli presented during driving. The tests involving coordination [ (including the walk-and-turn and the one-leg-stand) ] are probative of the ability to drive, as they examine control over the subject's own movements.

59 Am.Jur. Trials *Sobriety Checkpoints* § 7 (1996) (footnote added). Because the evidence procured by administration of psychomotor FSTs is within the common experience of the ordinary citizen, the majority of courts that have addressed the issue generally consider psychomotor FSTs to be nonscientific evidence. *See, e.g., Cumbie v. City of Montgomery*, 703 So.2d 423, 425 n. 1 (Ala.Crim. App.1997) (explaining that the battery of FSTs "typically includes the one-legged[-]stand test, the walk[-]and[-]turn test, and the touch[-]your[-]nose test, and all are designed to disclose physical manifestations of intoxication" and do not "require the evidentiary foundation for the admission of expert scientific testimony"); *State v. Superior Court*, 149 Ariz. 269, 718 P.2d 171, 178 (Ariz.1986) (distinguishing the HGN test, which rests upon an assertion of scientific legitimacy, from the psychomotor FSTs, which rely upon a basis of common knowledge, and holding that "[d]ifferent rules therefore apply to determine" the admissibility of HGN test results); *People v. Williams*, 3 Cal.App.4th 1326, 1333, 5 Cal.Rptr.2d 130, 134 (Cal.Ct.App.1992) (holding that psychomotor FSTs, unlike the HGN test, rest upon a basis of common knowledge, and that lay

---

**15.** The test Officer Chock described appears to be a test for "vertical nystagmus." In a resource guide for judges, prosecutors, and law enforcement officers that is published by the National Highway Traffic Safety Administration (NHTSA), entitled "Horizontal Gaze Nystagmus: The Science & the Law" (2000), *at* http://www.nhtsa.dot.gov/people/injury/enforce/nystagmus/hgntxt.html, it is mentioned that vertical nystagmus, which an officer checks for "by raising the object several inches above the subject's eyes[,]" is "not one of the HGN clues nor is it part of the standard field sobriety test [ (FST) ] battery." According to the publication, however, "vertical nystagmus is a good indicator of high doses of alcohol, other central nervous system (CNS) depressants or inhalants, and the

consumption of the drug phencyclidine (PCP)." *Id.*

**16.** According to the NHTSA:

> The walk-and-turn test and one-leg[-]stand test are "divided attention" tests that are easily performed by most unimpaired people. They require a suspect to listen to and follow instructions while performing simple physical movements. Impaired persons have difficulty with tasks requiring their attention to be divided between simple mental and physical exercises.

Anacapa Sciences, Inc., NHTSA, *Validation of the Standardized Field Sobriety Test Battery at BACs Below 0.10 Percent: Final Report* (1998), at 32–33 app.

witnesses may opine as to "another's state of intoxication when based on the witness's personal observations of such commonly recognizable signs as an odor of alcohol, slurring of speech, unsteadiness, and the like"); *Meador*, 674 So.2d at 831 (explaining that a defendant's ability to perform simple psychomotor tasks, "such as whether a foot is on a line or not[,]" is "within a juror's common experiences and understanding" and "[j]urors do not require any special expertise to interpret performance of these tasks"); *Hawkins v. State*, 223 Ga.App. 34, 476 S.E.2d 803, 807 (1996) (holding that expert testimony was not required as a foundation for admission of testimony regarding the results of psychomotor FSTs because these types of FSTs are not based upon a scientific principle or technique, but instead are "physical dexterity exercises that common sense, common experience, and the 'laws of nature' show are performed less well after drinking alcohol"); *People v. Sides*, 199 Ill.App.3d 203, 145 Ill.Dec. 160, 556 N.E.2d 778, 779–80 (1990) (concluding that the psychomotor FSTs "are not so abstruse as to require a foundation other than the experience of the officer administering them" and that "[n]o expert testimony is needed nor is a showing of scientific principles required before a jury can be permitted to conclude that a person who performs badly on the [psychomotor FSTs] may have his mental or physical faculties 'so impaired as to reduce his ability to think and act with ordinary care' "); *Crampton v. State*, 71 Md.App. 375, 525 A.2d 1087, 1093–94 (1987) (explaining that psychomotor FSTs are not scientific, but "essentially personal observations of a police officer which determine a suspect's balance and ability to speak with recollection"); *Commonwealth v. Sands*, 424 Mass. 184, 675 N.E.2d 370, 373 (1997) (distinguishing HGN test from psychomotor FSTs, which did not require foundational expert testimony because psychomotor FSTs "measure a person's sense of balance, coordination, and acuity of mind in understanding and following simple instructions" and "[a] lay juror understands that intoxication leads to diminished balance, coordination, and mental acuity from common experience and knowledge"); *People v. DiNonno*, 171 Misc.2d 335, 659 N.Y.S.2d 390, 390 (1997)

(explaining that since psychomotor FSTs are "not truly scientific in nature" but "are based upon the indisputable fact that intoxication affects physical coordination and mental acuity[,]" "proof of their acceptance in the scientific community is not required"); *State v. O'Key*, 321 Or. 285, 899 P.2d 663, 674–75 (1995) (agreeing that "the HGN test is distinguished from other [FSTs] because science, rather than common knowledge, provides the legitimacy for HGN testing"); *Commonwealth v. Ragan*, 438 Pa.Super. 505, 652 A.2d 925, 928 (1995) (unlike the evidence provided by the HGN test, a suspect's performance of psychomotor FSTs "is reflective of ordinary signs of intoxication discernible by a layperson"). As the Florida District Court of Appeals explained in *State v. Meador*:

> In assessing the defendant's mental and physical faculties at a time relevant to the charge that he [or she] was driving an automobile while under the influence of alcohol, it is entirely appropriate for the jury to consider the defendant's ability to perform the simple physical tasks which comprise the [FSTs]. The jury's inference that a defendant who had difficulty performing some of these tasks may have been similarly impaired in his ability to think and act with ordinary care when in operation of an automobile is entirely justified and one which the law permits the jury to draw.

> Certainly in our modern society, a juror's common observations and experiences in life would include not only the driving of an automobile, but a familiarity with the degree of physical and mental acuity required to do so.

> A defendant's ability to perform these simple psychomotor tasks is within a juror's common experiences and understanding. There are objective components of the field sobriety exercises, which are commonly understood and easily determined, such as whether a foot is on the line or not. Jurors do not require any special expertise to interpret performance of these tasks. Thus, evidence of the police officer's observations of the results of defendant's performing the walk-and-turn test [and] the one-leg[-]stand test . . . should be treated

no differently than testimony of lay witnesses (officers, in this case) concerning their observations about the driver's conduct and appearance.

The mere fact that the NHTSA studies attempted to quantify the reliability of the [FSTs] in predicting unlawful [Blood Alcohol Content (BAC) ] does not convert all of the observations of a person's performance into scientific evidence. The police officer's observations of the field sobriety exercises, other than the HGN test, should be placed in the same category as other commonly understood signs of impairment, such as glassy or bloodshot eyes, slurred speech, staggering, flushed face, labile emotions, odor of alcohol or driving patterns.

*Meador*, 674 So.2d at 831–32 (footnote omitted).

Similarly, the Oregon Court of Appeals explained that, unlike the HGN test, the psychomotor FSTs are nonscientific because "certain reactions to alcohol are so common that we take judicial notice of them." [17] *State v. Reed*, 83 Or.App. 451, 732 P.2d 66, 68 (1987).

■ We agree with the foregoing authorities that the psychomotor FSTs are nonscientific in nature. Therefore, we conclude that an arresting officer may be permitted to testify as to his or her physical observations about a DUI arrestee's performance on such tests and to give an opinion, based on such observations, as to whether the arrestee was intoxicated when arrested.

■ For the reasons discussed below, however, we conclude that an arresting officer may not, without a proper foundation being laid, testify that, in his or her opinion, a DUI arrestee "failed" the FSTs.

**B.** *The Arresting Officer's Opinion Testimony That Defendant Failed the FSTs*

In adjudging Defendant guilty of DUI under HRS § 291–4(a)(1), the district court stated that the following factors led it "to believe that [Defendant] was [DUI] in an amount sufficient to impair his normal mental faculties or ability to care for himself and guard against casualty."

[Defendant's] speed on the motorcycle was in excess of the speed that was posted, ... his eyes were red, ... the alcohol odor on his breath indicated some alcoholic consumption, the demeanor of his was slow and his speech slurred. *His performance on the [FSTs] were all failures according to the opinion of the police officer who administered those tests.*

(Emphasis added.) Defendant maintains that the district court should not have allowed [Officer Chock] to testify that Defendant had "failed" the FSTs. We agree.

In *State v. Nishi*, 9 Haw.App. 516, 852 P.2d 476 (1993), this court discussed the admissibility of the officer's opinion that the defendant had "failed to pass the 'heel-to-toe,' 'leg raised,' and 'arch back' [FSTs] that [the defendant] had undertaken to perform." *Id.* at 523, 852 P.2d at 480. The officer had not been qualified as an expert witness, *id.* at 521 n. 6, 852 P.2d at 479 n. 6, and this court focused on whether the officer's testimony was admissible as a lay opinion under Hawai'i Rules of Evidence (HRE) Rule 701 (1993).[18] We concluded that the admission of the testimony constituted error:

The commentary to HRE Rule 701 states that Rule 701 "retains the common-law requirement that lay opinion be based

---

**17.** Included among the reactions to alcohol that the Oregon Court of Appeals took judicial notice of in *State v. Reed*, 83 Or.App. 451, 732 P.2d 66 (1987), are: "(1) Odor of the breath[,] (2) Flushed appearance[,] (3) Lack of muscular coordination[,] (4) Speech difficulties[,] (5) Disorderly or unusual conduct[,] (6) Mental disturbances[,] (7) Visual disorders[,] (8) Sleepiness[,] (9) Muscular tremors[,] (10) Dizziness[, and] (11) Nausea." *Id.* at 68 n. 2 (emphasis and block quotation format omitted) (quoting *State v. Clark*, 286 Or. 33, 593 P.2d 123, 127 (1979)).

**18.** Hawai'i Rules of Evidence (HRE) Rule 701 (1993), which remains unchanged since our decision in *State v. Nishi*, 9 Haw.App. 516, 852 P.2d 476 (1993), states as follows:

**Opinion testimony by lay witnesses.** If the witness is not testifying as an expert, the witness' [sic] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness' [sic] testimony or the determination of a fact in issue.

upon firsthand knowledge[.]" Thus, for an opinion testimony to be admissible under HRE Rule 701, "the witness must have personal knowledge of matter that forms the basis of testimony of opinion; the testimony must be based rationally upon the perception of the witness; and of course, the opinion must be helpful to the jury (the principal test)." 1 J. Strong, *McCormick on Evidence* (hereinafter *McCormick* ) § 11, at 45–46 (4th ed.1992) (footnotes omitted). The "rational" test means whether the opinion "is one which a normal person would form on the basis of the observed facts." 3 J. Weinstein & M. Berger, *Weinstein's Evidence* (hereafter *Weinstein's Evidence* ) ¶ 701[02], at 701–18 (1992) (footnote omitted). Also, "where relevancy requires, a foundation must be laid as to the witness' [sic] personal knowledge of facts to which the observed facts are being compared." [7] *McCormick* § 11 at n. 22. Finally, "Rule 701 is a rule of discretion." *Weinstein's Evidence* ¶ 701[02] at 701–31.

7. For example, "[b]efore an occurrence witness can testify that the car was going about 70 m.p.h., a foundation must be laid establishing the witness' [sic] personal knowledge of how fast 70 m.p.h. really is." J. Strong, *McCormick on Evidence* § 11 at n. 22 (4th ed.1992).

*Id.* at 521–22, 852 P.2d at 479. We explained that while generally, a lay witness who had time to observe a person could testify as to that person's state of sobriety,

[FSTs] are designed and administered to avoid the shortcomings of casual observation. They are premised upon the relationship between intoxication and the externally manifested loss of coordination it causes. They essentially require the sus-

19. As discussed above, the court may require that foundation be laid to establish "the witness' [sic] personal knowledge of facts to which the observed facts are being compared." 1 J. Strong, *McCormick on Evidence* § 11, at 45 n. 22 (4th ed.1992).

20. Specifically, the court explained:

I'm not really, frankly, looking at the officer's specific evaluation. I'm evaluating the picture that I get of what the defendant did that day.

* * * * * *

[The defendant's] balance was extremely poor from what I can see here. He had balance and

pected driver to go through prescribed routines so his [or her] physical characteristics may be observed by the police.

*Id.* at 522, 852 P.2d at 479–80 (quoting *State v. Wyatt*, 67 Haw. 293, 302, 687 P.2d 544, 551 (1984)) (quotation marks and citations omitted). Accordingly, we concluded that the officer's testimony that the defendant had "failed" the FSTs was inadmissible for failing to meet the rationality test for admission as a lay opinion because the opinion was not one that a normal person would form based on the observed facts. "A normal person," we explained, "may not necessarily form such an opinion if he or she had not been taught to grade the performance of the three [FSTs]. In other words, this was a situation where foundational evidence as to [the officer's] knowledge of HPD's field sobriety testing procedures was necessary." [19] *Id.* at 523, 852 P.2d at 480. We therefore concluded that the trial court had abused its discretion in permitting the officer to opine that the defendant had failed the FSTs. However, noting that a court, and not a jury, had tried the defendant and that the record on appeal clearly disclosed that the trial court had not considered or relied upon the officer's opinion testimony in finding the defendant guilty of DUI,[20] we held that the error did not prejudice the defendant and was harmless beyond a reasonable doubt.

Subsequently, in *State v. Toyomura*, the Hawai'i Supreme Court was called upon to decide whether a proper foundation had been laid to permit a police officer to testify that in his opinion, Toyomura, the defendant, had failed the FSTs, was intoxicated, and had a BAC that was in excess of the then-existing BAC statutory limit of .10.[21] *Toyomura*, 80

coordination problems on every one of the tests.

*Nishi*, 9 Haw.App. at 524, 852 P.2d at 480.

21. In *State v. Toyomura*, 80 Hawai'i 8, 904 P.2d 893 (1995), the following colloquy occurred while the arresting police officer was on the stand during the trial of a DUI defendant:

THE COURT: Okay. *Do you have an opinion about [the defendant's] sobriety on that night?*

. . . .

[OFFICER]: *My opinion was, based on my observations and from the results of the [FST], I believed that he was over the amount of alcohol that was allowed by law.*

Hawai'i at 24, 904 P.2d at 909. Adopting and approving this court's analysis in *Nishi*, the supreme court held:

> Toyomura is correct in his assertion that a police officer may not testify, *without proper foundation*, about his opinion about whether a DUI defendant is intoxicated ... based on FSTs. Toyomura is also correct in observing that insufficient foundation was laid to permit [the officer], *based on Toyomura's performance of the FSTs*, to render a lay opinion as to whether he was intoxicated, inasmuch as the prosecution elicited no testimony establishing that (1) the [HGN], "one-leg[-]stand," and "walk-and-turn" procedures were elements of the HPD's official FST protocol, (2) there was any authoritatively established relationship between the manner of performance of these procedures and a person's degree of intoxication, and (3) [the officer] had received any specific training in the administration of the procedures and the "grading" of their results. Therefore, Toyomura is correct that [the officer] was improperly permitted to render an opinion that he (*i.e.* Toyomura) was intoxicated based in part on [the officer's] assessment of the results of the FSTs. Finally, Toyomura is correct in his assertion that [the officer] was neither properly offered as an expert witness nor regarded as such by the district court, which expressly stated that (1) it was considering "only the observations of the officer" and "not his grading" of the FSTs themselves and (2) it would consider [the officer's] testimony "from a lay point of view."

> Toyomura is simply wrong, however, in concluding that "the rule in *Nishi* was violated in this case" in such a manner as to require that his DUI conviction be vacated. As the trial court correctly noted, "any lay person," including a police officer, "can have an opinion regarding sobriety." As set forth above, [the officer] expressly testified that, over the course of his ap-

proximately nineteen years as a police officer, he "had an opportunity to observe people who had been drinking and at different levels." And, as noted, the record reflects that the trial court both assured Toyomura that he was considering [the officer's] testimony "only from a lay point of view" and that the trial court applied its independent assessment of the evidence in finding Toyomura guilty of DUI.

*Id.* at 26–27, 904 P.2d at 911–12 (brackets, ellipsis, footnote, and quotation marks omitted; emphases in original).

Pursuant to *Nishi* and *Toyomura*, therefore, it is permissible for a police officer to testify as a lay witness about his or her observations of a defendant's performance on various FSTs and to give an opinion, based on such observations, that the defendant was intoxicated. However, unless proper foundation is laid, it is improper for a police officer to testify that in his or her opinion, a defendant "failed" or "passed" a FST. As the Florida District Court of Appeals noted in *Meador*, 674 So.2d at 832–33:

> While the psychomotor [FSTs] are admissible, we agree with defendants that any attempt to attach significance to defendants' performance on these exercises beyond that attributable to any of the other observations of a defendant's conduct at the time of the arrest could be misleading to the jury and thus tip the scales so that the danger of unfair prejudice would outweigh its probative value. The likelihood of unfair prejudice does not outweigh the probative value as long as the witnesses simply describe their observations.

> Reference to the exercises by using terms such as "test," "pass," "fail," or "points," however, creates a potential for enhancing the significance of the observations in relationship to the ultimate determination of impairment, as such terms give these layperson observations an aura of scientific validity. Therefore, such terms should be avoided to minimize the danger

[DPA]: Could you answer the same question without referring to any numerical or legal? How would you describe it?

[OFFICER]: You're asking me to give a percentage, plus or minus? I would say that he was above a .10 ... reading.

[DPA]: Okay. And, just normal language for people unfamiliar with tests as such, how would you describe it?

[OFFICER]: He was intoxicated.

*Id.* at 14, 904 P.2d at 899 (emphases in original).

that the jury will attach greater significance to the results of the field sobriety exercises than to other lay observations of impairment.

*Id.* at 832 (citations omitted).

The Oregon Supreme Court similarly noted the danger of affording undue scientific validity to lay opinions, explaining that

[e]vidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power.[6] The function of the court is to ensure that the persuasive appeal is legitimate. The value of proffered expert scientific testimony critically depends on the scientific validity of the general propositions utilized by the expert. Propositions that a court finds possess significantly increased potential to influence the trier of fact as scientific assertions, therefore, should be supported by appropriate scientific validation. This approach ensures that expert testimony does not enjoy persuasive appeal of science without subjecting its propositions to the verification processes of science.

6. "There is virtual unanimity among courts and commentators that evidence perceived by jurors to be 'scientific' in nature will have particularly persuasive effect." John William Strong, *Language and Logic in Expert Testimony: Limiting Expert Testimony by Restrictions of Function, Reliability, and Form*, 72 Or.L.Rev. 349, 367 n. 81 (1992) (citing cases). See *People v. Leahy*, 8 Cal.4th 587, 595, 34 Cal.Rptr.2d 663, 667, 882 P.2d 321, 325 (1994)("[l]ay jurors tend to give considerable weight to scientific evidence when presented by experts with impressive credentials"); *State ex rel. Hamilton v. City Court of City of Mesa*, 165 Ariz. 514, 518, 799 P.2d 855, 859 (1990) ("[o]ne danger inherent in the use of scientific evidence is that the jury may accord it undue significance because it associates 'science' with truth"); 3 Jack B. Weinstein, Margaret A. Berger, & Joseph M. McLaughlin, *Weinstein's Evidence* ¶ 702[03], 702–50 (1995) (jurors may be overly impressed with the aura of reliability surrounding scientific evidence and thereby surrender their role of critical assessment).

*O'Key*, 899 P.2d at 672 (brackets, citations, and quotation marks omitted).

■ In this case, Officer Chock testified that, in his opinion, Defendant "failed" each of the FSTs administered to Defendant and "failed" the FSTs overall. However, the State did not lay a proper *Toyomura* foundation for the admission of Officer Chock's

opinion as to whether Defendant "passed" or "failed" Defendant's performance on the psychomotor FSTs. Officer Chock testified that he was taught to administer and grade the walk-and-turn, the one-leg-stand, and the HGN tests through training at the police academy and that he was certified to administer these tests. Furthermore, Officer Chock explained the testing procedures, as well as the indicia of intoxication that he looked for, in observing Defendant's performance of the tests. However, the State failed to adduce evidence that the FSTs administered were elements of HPD's official FST protocol. Accordingly, we conclude that the State failed to meet the requirements set forth in *Toyomura* for the admission of Officer Chock's opinion that Defendant failed the FSTs.

■ We also conclude that the district court erred when it relied upon Officer Chock's opinion that Defendant "failed" the FSTs, rather than on Defendant's actions or demeanor in performing the FSTs, in concluding that Defendant was DUI under HRS § 291–4(a)(1).

### C. Whether Probable Cause Existed for Defendant's Arrest

Defendant contends that the district court should have granted his motion for judgment of acquittal because Officer Chock admitted that, without the evidence of Defendant's failure to pass the FSTs, he lacked probable cause to arrest Defendant for DUI. We disagree.

■. The Hawai'i Supreme Court has held that the *de novo* standard applies in appellate reviews of probable cause determinations. *State v. Navas*, 81 Hawai'i 113, 123, 913 P.2d 39, 49 (1996). Probable cause refers to the "state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." *State v. Naeole*, 80 Hawai'i 419, 424, 910 P.2d 732, 737 (1996). Moreover, "probable cause is generally based upon a combination of factors, which together form a sort of mosaic, of which any one piece by itself often might not be enough to constitute probable cause, but

which, when viewed as a whole, does constitute probable cause." *State v. Chong,* 52 Haw. 226, 231, 473 P.2d 567, 571 (1970). Accordingly, we consider the totality of the circumstances to determine, *de novo,* whether Officer Chock had probable cause to arrest Defendant.

■ Although the district court acquitted Defendant of the speeding charge due to the State's failure to prove that the two speed limit signs that Defendant had passed were "official" City and County of Honolulu traffic control devices, the district court expressly found that Defendant was traveling at an excessive rate of speed and that "there was reasonable suspicion for a motor vehicle stop in this case." Additionally, the district court found that Defendant's eyes were red, Defendant had an odor of alcohol on his breath that indicated alcohol consumption, Defendant's demeanor was slow, and his speech was slurred. Officer Chock further testified as to his observations of Defendant's performance on the psychomotor FSTs. Giving deference to the findings of the district court, we conclude that the foregoing circumstances were sufficient to lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion that Defendant was DUI "in an amount sufficient to impair [his] normal mental faculties or ability to care for [himself] and guard against casualty[.]"

That is, probable cause existed to arrest Defendant for DUI. Therefore, as long as the evidence that Defendant's BAC was above the legal limit was properly obtained and admissible at trial to support a conviction of Defendant as DUI pursuant to HRS § 291-4(a)(2), we conclude that the evidence was sufficient to support a prima facie case of Defendant's guilt. The district court proper-ly denied Defendant's Motion for Judgment of Acquittal.

### D. The Intoxilyzer Test Results

Defendant contends that his motion to strike the results of his Intoxilyzer Model 5000 breath test was erroneously denied for several reasons. We address each of Defendant's arguments separately.

### 1. Officer Chock's Competence to Testify

Defendant first asserts that Officer Chock did not have sufficient present recollection of the result of the breath test for him to be competent to testify about it. He argues that under HRE Rule 602 [22] and this court's decision in *State v. Dibenedetto,* 80 Hawai'i 138, 906 P.2d 624 (App.1995), "[a] present recollection of what the officer wrote in his report is not an adequate substitute for a present recollection of the event at issue."

HRE Rule 602 generally requires that a witness have personal knowledge of matters to which he or she testifies. HRE Rule 612 [23] allows for the use of writings to refresh the memory of a witness, thus bringing the matters within the realm of the witness's personal knowledge. The Commentary to HRE Rule 612 states:

This rule is identical with [Federal Rules of Evidence (FRE) Rule] 612, except that the federal rule begins with the phrase, "Except as otherwise provided in criminal proceedings by section 3500 of title 18, United States Code," and this phrase is omitted here as inappropriate. The Advisory Committee's Note to [FRE Rule] 612 points out that "[t]he purpose of the rule is ... to promote the search of credibility and memory."

**Writing used to refresh memory.** If a witness uses a writing to refresh the witness' [sic] memory for the purpose of testifying, either:
(1) While testifying, or
(2) Before testifying, if the court in its discretion determines it is necessary in the interests of justice,
an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness....

22. HRE Rule 602 provides:

**Lack of personal knowledge.** A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' [sic] own testimony. This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses.

23. HRE Rule 612 provides, in pertinent part:

This rule restates existing Hawai'i [Hawai'i] law found in *State v. Altergott,* 57 [Haw.] 492, 503, 559 P.2d 728, 736 (1977), where the court observed: "A writing which is used to refresh the recollection of a witness, it is said by Wigmore, differs from a record of past recollection in being in no strict sense evidence, so that the offering party has no right to have the jury see it although the opponent may show it to the jury and the jury may demand it." In other words, the writing used to refresh memory is not evidence, and therefore does not present hearsay problems, because, after refreshing, the witness testifies from present memory, and the writing serves merely as a jog to present memory. If the witness has no present memory, as in the case where the attempt to refresh under this rule is unsuccessful, then the admissibility of the writing is governed by hearsay doctrine (especially Rule 802.1(4), "Past recollection recorded") and the authentication and original document requirements of Articles IX and X.

The purpose of FRE Rule 612, upon which HRE Rule 612 is based, is

to "refresh memory" when it enables a witness who suffers from loss of memory to recall at the time of his [or her] testimony matters he [or she] perceived in the past. In other words, when a writing is used for these purposes, it simply facilitates the witness' [sic] testimony and is not itself offered into evidence. Thus, where a witness never perceived the matters described or where the writing does not reawaken recollection of past perception, Rule 612 does not permit a witness to simply read into evidence the contents of the writing.

28 C. Wright & V. Gold, *Federal Practice and Procedure: Evidence* § 6183, at 446 (1993) (footnotes omitted).

In *Dibenedetto,* the arresting officer testified regarding his observations of the FSTs:

Q. [ (Defense Counsel) ] .... earlier you testified that you don't remember all the particulars of this [FST] that you refreshed your memory ... using this sheet and the other sheets that you filled out?

A. [Officer]. Yes.

. . . .

Q. ... how big was the gap between [the defendant's] heel and toe on that fourth step ... in the horizontal walk and turn?

A. I don't recall exactly the distance of the gap, no.

Q. You don't recall the distance of the gap so you are basically testifying to that distance on that gap from ... this sheet of paper....

A. Yes.

Q. *Without memory of what actually happened?*

A. Yes.

. . . .

Q. ... is it fair to say that your memory as to what the actual events are is pretty cloudy ... *what you have is memory of your recently reviewing this [FST] document?*

A. *Yes.*

*Dibenedetto,* 80 Hawai'i at 141, 906 P.2d at 627 (some brackets added, some omitted; emphases in original). On appeal, the defendant challenged the admission of the officer's testimony on grounds that the officer did not have a present recollection of the test he had administered and, therefore, did not have personal knowledge of the matters to which he was testifying. In discussing the prosecution's use of a police report to "refresh" the officer's recollection, we explained that

[HRE] Rule 612 indicates that "a witness may use a writing to refresh his memory for the purpose of testifying...." A writing, such as a police report, used to refresh a witness's memory is ordinarily not submitted into evidence. 3 J. Wigmore, *Evidence in Trial at Common Law* § 763, at 142 (Chadbourn rev. ed.1970). When used to refresh the witness's present recollection, a writing is solely employed to jog the memory of the testifying witness. 1 J. Strong, *McCormick on Evidence* § 9, at 29 (4th ed.1992). Accordingly, when a writing is used to refresh a witness's recollection, the witness should testify from "a memory thus revived," resulting in testimony from present recollection, not a

memory of the writing itself. *Id.* "A witness's recollection must be revived after he or she consults the particular writing or object offered as a stimulus so that ... the resulting testimony relates to a present recollection." 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 612[01], at 612–16 (1995). If the writing fails to rekindle the witness's memory, the witness cannot be permitted to testify as to the contents of the writing unless the writing is otherwise admitted into evidence. 28 C. Wright & V. Gold, *Federal Practice and Procedure: Evidence* § 6183, at 463 (1993).

*Id.* at 144, 906 P.2d at 630 (brackets omitted). We stated, moreover, that

> [b]ecause a witness cannot be permitted to testify if the witness has no present recollection, there can be only one correct answer to the question of whether the witness had a present recollection of the material events reviewing the writing and setting it aside. Consequently, we apply the "right/wrong" standard in determining the correctness of a ruling that the witness's attempt to refresh his or her memory resulted in a present recollection of the subject events.

*Id.* at 145, 906 P.2d at 631. In light of the officer's candid testimony in *Dibenedetto,* we concluded that the officer did not have a present recollection of the test he had earlier administered and therefore agreed with the defendant that the officer's testimony about the test should have been stricken.

In the instant case, Officer Chock, unlike the officer in *Dibenedetto,* did not testify that he had no memory of administering the Intoxilyzer test to Defendant. Although Officer Chock admitted that he could not recall the "exact number" of Defendant's Intoxilyzer test result and "needed [his] report in order to refresh [his] memory[,]" Officer Chock remembered that the result "was over .08." On redirect examination, moreover, Officer Chock testified that the number that appeared on the Intoxilyzer screen was the number that he wrote down on his report, and that at the time of testimony, the number listed on the report reflected what he saw at the time of the actual Intoxilyzer test.

Based on the circumstances in this case, we conclude that Officer Chock had sufficient personal knowledge of the Intoxilyzer test that he administered to Defendant and was therefore competent to testify as to the results of the test. We also conclude that when Officer Chock could not remember the exact reading of Defendant's Intoxilyzer test result, which, given the passage of time, was understandable, it was proper under HRE Rule 612 for the State to allow Officer Chock to review the report of Defendant's Intoxilyzer test and refresh his present recollection as to Defendant's exact score on the test.

### 2. The District Court's Finding that Defendant's BAC Exceeded the Legal Limit

At trial, Defendant moved for a judgment of acquittal on grounds that the prosecution's case-in-chief failed to produce any evidence that could support the HRS § 291–4(a)(2) alternative method of proving the DUI charge. Defendant argued:

> Specifically what the statute requires is that you have to have evidence of a breath alcohol concentration in excess of 200—in excess of .08 grams of alcohol per 210 liters of breath.
>
> Testimony that there was the result of the test was a .164. There was no testimony whatsoever that the [I]ntoxilyzer in any way, shape or form correlates a .164 reading to any particular quantity of grams of alcohol per liters of breath. Grams is a measure of weight. Liters is a measure of volume.
>
> There was no testimony whatsoever—I mean, the testimony was that the result was .164, but sitting in a vacuum by itself and there was no request on the part of the prosecution to take judicial notice of the [I]ntoxilyzer being a device that reports numerically a relationship between grams of alcohol and liters of breath. Grams is a measure of weight. Liters is a measure of quantity.

In convicting Defendant of DUI, the district court orally stated: "[T]he testimony came in beyond a reasonable doubt that [Defendant] was [DUI] while blood (sic) alcohol was above

.08. So the [c]ourt does find [Defendant] guilty as charged." Defendant claims that

> [the district court's .08] finding of fact failed to express whether ".08" refers to any particular measure of weight (e.g.grams, milligrams, micrograms, etc.). It also failed to make any finding of fact with respect to the relationship of the ".08" to any particular measure of volume (e.g. ".08 or more grams of alcohol per 210 liters of breath", or even ".08 or more grams of alcohol per 100 milliliters or cubic centimeters of blood.["] ) [24]

(Footnote added.) We disagree.

While HRS § 291–4(a)(2) sets forth different quantitative formulas for measuring the percentage of alcohol in breath and blood samples, the ratio of the grams of alcohol to breath and blood under either formula must be above .08. Given the testimony at trial, the district court's finding that Defendant's blood alcohol was above .08 was clearly meant to refer to the .08 limit set forth in HRS § 291–4(a)(2).

**24.** Pursuant to HRS § 291–4(a)(2) (Supp.1999), to establish a violation of DUI, the State must establish that the person operates a motor vehicle with ".08 or more grams of alcohol per one hundred milliliters or cubic centimeters of blood or .08 or more grams of alcohol per two hundred ten liters of breath."

**25.** We noted in *Ito:*

> The Intoxilyzer is a machine that measures the concentration of alcohol in a breath sample (BrAC). 2 R. Erwin, *Defense of Drunk Driving Cases* § 21.01, at 21–2 to 21–3 (3d ed. 1999) (*Defense of Drunk Driving*); *see also State v. Gates,* 7 Haw.App. 440, 777 P.2d 717 (1989). The Intoxilyzer then reports either an assumed blood alcohol concentration (BAC) (which is achieved by multiplying the individual's BrAC by a conversion factor, a partition ratio of 2100 to 1), *Gates,* 7 Haw.App. at 443, 777 P.2d at 719, or a BrAC which is "usually in terms of grams [of] alcohol per 210 liters of breath, such as 0.10g/210L." 2 *Defense of Drunk Driving* § 21.01, at 21–2 to 21–3. "The assumption is that a BrAC of 0.10g/210L is equivalent to a BAC of 0.10 [percent]." *Id.* at 21–3. Strictly speaking, expressing BAC as a percentage is not truly accurate because what is being expressed as a percentage is really a comparison of weight to volume. *City of Monroe v. Robinson,* 316 So.2d 119, 121 n. 1 (La.1975); 2 *Defense of Drunk Driving,* § 15.02[3], at 15–9. The practice of expressing BAC as a percentage of weight per volume (/v) stems from "[a]

Moreover, as we noted in *Ito,* the reading on the Intoxilyzer can be construed to establish both a breath alcohol content (grams of alcohol per two hundred ten liters of breath) and blood alcohol content (grams of alcohol per one hundred milliliters or cubic centimeters of blood).[25] *Ito,* 90 Hawai'i at 228 n. 2, 978 P.2d at 194 n. 2. Therefore, even if a breath sample were used to measure Defendant's level of intoxication, the Intoxilyzer was able to convert the alcohol content in Defendant's breath to the equivalent blood alcohol content.

### 3. The Absence of an Intoxilyzer Supervisor

Defendant asserts that his Intoxilyzer test results must be stricken because HAR Title 11, chapter 114, the rules promulgated by the State of Hawai'i Department of Health to regulate the testing of blood and breath for alcohol concentration, specifically, HAR §§ 11–114–4 and 11–114–9, require that a licensed supervisor be present when a test is administered [26] and no supervisor was present when he was tested.

> laboratory practice widely followed in this country and elsewhere for expressing solution strengths when small quantities of a liquid or a solid are dissolved in a relatively large amount of a liquid[.]" *City of Monroe,* 316 So.2d at 121 n. 1, *Commonwealth v. Brooks,* 366 Mass. 423, 319 N.E.2d 901, 906 (1974).
>
> The reason for this is that measurement by weighing is the only accurate way to quantify extremely small amounts of substance. Expensive analytical balances in laboratories ... are capable of precisely determining weight even down to the fraction of a milligram. For the liquid, however, the most convenient method of measurement is volumetric.
>
> The most straightforward method of expressing solution strength is to put it simply in terms of number of milligrams of the substance per milliliter of solution—or, if more convenient, per 100 milliliters of solution.

*State v. Ito,* 90 Hawai'i at 228 n. 2, 978 P.2d at 194 n. 2.

**26.** In *State v. Kemper,* 80 Hawai'i 102, 905 P.2d 77 (App.1995), we explained the role of the HAR in governing the administration of the Intoxilyzer test:

> The State Department of Health has adopted rules and regulations with respect to the "Testing of Blood, Breath and Other Bodily Substances for Alcohol Concentration" (Rules) to assure "proper 'scientific and technical' procedures in the testing for blood alcohol concen-

HAR § 11–114–4, which includes definitions for terms used in subchapter 2 of HAR Title 11, chapter 114, defines a "supervisor" as "a person who supervises operators of breath alcohol testing instruments and meets the requirements of section 11–114–9." HAR § 11–114–9, entitled *"Supervisors,"* provides, in pertinent part, as follows:

(a) Supervisors of breath alcohol testing instruments shall be responsible for:

(1) The care of breath alcohol testing instruments;

(2) Insuring that instruments are maintained;

(3) Performing accuracy tests required by section 11–114–7;

(4) Performing or supervising, or both, breath alcohol tests;

(5) Reporting results of alcohol breath tests to appropriate governmental agencies as required by section 11–114–11;

(6) Keeping records as required by section 11–114–12;

(7) Training of operators when required; and

(8) Insuring that the operators and instruments in the supervisor's charge adhere to the provisions of this subchapter.

■ The Hawai'i Supreme Court has stated that in construing rules, courts must look first at the language of the rules. "If [a] ... rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning." *Keanini,* 84 Hawai'i at 413, 935 P.2d at 128 (App.1997) (quoting *International Brotherhood of Electrical Workers, Local 1357,* 68 Haw. at 323, 713 P.2d at 950).

■ Examining the plain language of HAR §§ 11–114–4 and 11–114–9, we disagree with Defendant that the rule requires a su-

pervisor to either administer or be present to supervise the administration of an Intoxilyzer test. Although the rule defines a supervisor as "a person who supervises operators of breath alcohol testing instruments[,]" there is no explicit requirement that the supervisor be present whenever a test is administered. Additionally, § 11–114–9 provides only that a supervisor is responsible for performing or supervising breath alcohol tests, and does not make explicit reference to the supervisor's presence at the time the test is performed. Accordingly, we conclude that Defendant is incorrect in asserting that the HAR required that a licensed supervisor be present for the administration of the Intoxilyzer test in the instant case.

We note, additionally, that HAR § 11–114–6, which relates to "procedure approvals and measurement requirements," does not explicitly require the presence of a licensed supervisor. It provides in pertinent part:

(b) With every breath alcohol test the following shall be met:

(3) A copy of the approved breath alcohol testing procedure shall be accessible to the operator *or* supervisor;

(4) The test shall be conducted by a person who is licensed as a breath alcohol testing supervisor *or* operator pursuant to section 11–114–9 or 11–114–10;

(Emphases added.) Accordingly, under this provision, the test may be performed by a licensed operator *or* supervisor.

Because we conclude that no requirement for a supervisor's presence at the administration of every Intoxilyzer test exists within the HAR, we conclude that the district court properly denied Defendant's motion to strike the breath test evidence on this basis.

### 4. *Erroneous Taking of Judicial Notice*

■ Defendant's final argument is that the district court erred in granting the State's "erroneous request to take judicial

tration[.]" *[State v.] Souza,* 6 Haw.App. [554,] 560, 732 P.2d [253,] 258 [ (1987) ]. Therefore, we have held that "in meeting the foundational prerequisites for the admission of the Intoxilyzer test result there must be a showing of strict compliance with those provisions of the Rules

which have a direct bearing on the validity and accuracy of the test result." *State v. Matsuda,* 9 Haw.App. 291, 293, 836 P.2d 506, 508 (1992) (citation and internal quotation marks omitted). *Id.* at 105, 905 P.2d at 80.

notice that the Intoxilyzer [Model] 5000 '. . . is accepted as . . . accurate to test *blood* alcohol with in the State of Hawaii [Hawai'i].' " Defendant argues that this finding was erroneous because (1) Defendant took a breath test that measured breath alcohol content, (2) Defendant never took any type of test that measures blood alcohol content, and (3) there was no competent evidence adduced at trial regarding any alleged blood alcohol content. We disagree.

HAR Title 19, chapter 36, promulgated by the State Department of Transportation, Motor Vehicles Safety Office "establish[es] a system for the detection of persons driving under the influence of alcohol[.]" HAR § 19–136–1. HAR § 19–136–3 provides:

> **Instrument of [I]ntoxilyzer utilized.** The instrument or [I]ntoxilyzer to be used in the test of breath samples to determine the *alcoholic content of the blood of a person tested* shall be the 4011 AS *or any other instrument specified in the [NHTSA] Qualified Products List of Evidential Breath Testers for Alcohol Content under the Federal Standard for Devices to Measure Breath Alcohol* (44 Fed.Reg. no. 111, p. 32781, June 4, 1979; also on 47 Fed.Reg. no. 43, p. 9313, March 4, 1982; both amending 39 Fed.Reg. 41399).

(Emphases added.) Similarly, the supreme court has noted:

> The apparatus to be used in the approved test of breath samples to determine the *alcoholic content of the blood of a person* tested shall be one which qualifies for the [NHTSA] Qualified Products List of Evidential Breath Testers for Alcohol Content under the Federal Standard for Devices to Measure Breath Alcohol (38 F.R. 30459 November 5, 1973 *or any subsequent revision thereof*).

*State v. Tengan*, 67 Haw. 451, 462, 691 P.2d 365, 372–73 (1984) (emphases added) (quoting Hawai'i Highway Safety Coordinator, *An Agency Statement Concerning the Testing of Blood and Breath Samples to Determine the Alcoholic Content Thereof* pt. II(A) (1976)). At the time the Intoxilyzer test was adminis-

tered, the Intoxilyzer Model 5000 was listed among the products that conformed to the model specifications of the NHTSA.[27] *Notice: Conforming Products List for Instruments that Conform to the Model Specifications for Evidential Breath Testing Devices,* 63 Fed.Reg. 10,066 (1998). The notice explained:

> On November 5, 1973, the [NHTSA] published the Standards for Devices to Measure Breath Alcohol (38 FR 30459). A Qualified Products List of Evidential Breath Measurement Devices comprised of instruments that met this standard was first issued on November 21, 1974 (39 FR 41399).
>
> On December 14, 1984 (49 FR 48854), NHTSA converted this standard to Model Specifications for Evidential Breath Testing Devices, and published a Conforming Products List (CPL) of instruments that were found to conform to the Model Specifications as Appendix D to that notice (49 FR 48864).

*Id.* The notice explicitly amended the "Qualified Products List of Evidential Breath Testers for Alcohol Content under the Federal Standard for Devices to Measure Breath Alcohol," referenced in HAR § 19–136–3. Accordingly, pursuant to HAR § 19–136–3 and the notice of the NHTSA, as incorporated by reference, the Intoxilyzer Model 5000 is accepted in Hawai'i to test breath samples for the alcoholic content of a person's blood.

This court has also noted that the State may use the Intoxilyzer test to establish blood alcohol content. We recognized the general acceptance of the scientific community that breath samples may be used for a determination of blood alcohol content. *State v. Gates,* 7 Haw.App. 440, 445, 777 P.2d 717, 720 (1989). Moreover, we noted that through the use of a partition ratio, the breath alcohol results obtained through the use of the Intoxilyzer can be converted into an assumed blood alcohol content. *Id.* at 443, 777 P.2d at 719. Therefore, we conclude that the district court did not err in taking

---

**27.** The effective date of the notice was February 27, 1998. *Notice: Conforming Products List for Instruments that Conform to the Model Specifica-* *tions for Evidential Breath Testing Devices,* 63 Fed.Reg. 10,066 (1998).

judicial notice of the Intoxilyzer Model 5000 as an accurate measure of Defendant's blood alcohol concentration.

## CONCLUSION

Based on the foregoing discussion, we affirm the district court's June 1, 1999 Judgment convicting Defendant of DUI, in violation of HRS § 291–4(a)(2).