111 P.3d 28

STATE of Hawai'i, Plaintiff–Appellee,

v.

Ernest L. GRACE, Sr., Defendant–Appellant.

No. 25970.

Intermediate Court of Appeals of Hawai'i.

March 21, 2005.

Phyllis J. Hironaka, Deputy Public Defender, State of Hawai'i, on the briefs, for defendant-appellant.

Mary Ann J. Holzl–Davis, Deputy Prosecuting Attorney, County of Hawai'i, on the briefs, for plaintiff-appellee.

BURNS, C.J., LIM and FUJISE, JJ.

Opinion of the Court by LIM, J.

Ernest L. Grace, Sr. (Grace) appeals the June 13, 2003 judgment of the Family Court of the Third Circuit[1] that convicted him of abuse of a family or household member, a violation of Hawaii Revised Statutes (HRS) § 709–906(1) (Supp.2004).[2] Because the family court admitted hearsay against Grace that violated bedrock Sixth Amendment confrontation clause[3] rights—as those rights were recently radically reinterpreted by the United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)—and because the error was not harmless beyond a reasonable doubt despite substantial evidence in support of the conviction, we vacate and remand.

## I. Background.

At Grace's bench trial, his wife, Samara Grace (Samara), testified first for the State. Samara remembered that on July 31, 2002, at around eight in the morning, she took her daughter to play in the park near their Hilo

---

1. The Honorable Terence T. Yoshioka presided.

2. Hawaii Revised Statutes (HRS) § 709–906(1) (Supp.2004) provides, in pertinent part: "It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member[.]" *See also* HRS § 702–204 (1993) ("When the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly"); *State v. Eastman*, 81 Hawai'i 131, 140, 913 P.2d 57, 66 (1996) (pursuant to HRS § 702–204, "the requisite state of mind for a violation of HRS § 709–906(1) is that of acting intentionally, knowingly, or recklessly"); *State v. Tomas*, 84 Hawai'i 253, 257, 933 P.2d 90, 94 (App.1997) ("to 'physically abuse' someone under HRS § 709–906(1) means to maltreat in such a manner as to cause injury, hurt or damage to that person's body" (citations and some internal

quotation marks omitted)), *overruled on other grounds by State v. Gonsales*, 91 Hawai'i 446, 984 P.2d 1272 (App.1999); *State v. Nomura*, 79 Hawai'i 413, 415–16, 903 P.2d 718, 720–21 (App. 1995) (in a prosecution for abuse of a family or household member, jury instructions defining "physical abuse" as "causing bodily injury to another person[,]" and "bodily injury" as "physical pain, illness or any impairment of physical conditions [sic,]" were not incorrect (block quote format omitted)).

3. The Sixth Amendment to the United States Constitution states, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" *Cf.* Article I, section 14 of the Hawai'i Constitution, which provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against the accused[.]"

apartment. Samara had other children[4] with her as well—"a whole buncha kids . . . . running from ages 10 to 6." Samara took her cell phone with her to the park. She also took Grace's cell phone. Grace stayed in the apartment.

Early that evening, Samara was using Grace's cell phone when he appeared in the park and demanded, "Gimme da phone." Samara could tell he had been drinking. "I could smell the liquor on him." In Samara's estimation, "He was already feeling good drunk[.]" Samara did not relinquish the phone because she was using it to converse with her grandmother in Honolulu. Then, "He just grabbed the phone. And when— when he grabbed it he scratched me, like grabbing the phone and scratched me . . . . Like, it didn't have the marking. It just showed red, but it went away." Angry with Grace because he had wrested the phone from her, Samara used her own cell phone to call the police. They arrived about ten minutes later and arrested Grace. The deputy prosecuting attorney (DPA) asked, "Is it your testimony that nothing else happened besides the defendant taking the phone away from you?" Samara answered, "Yeah."

At this point, the DPA produced a statement form that Samara had filled out and signed shortly after the cell phone incident. It stated that Grace had hit her during the incident. Samara explained: "No. He never hit—he never punched me, but he grabbed the phone, and I was on my meds when he did that." Samara maintained that she was upset with Grace and wanted to get back at him when she filled out the form, and that what she wrote was not true. Samara acknowledged she was still married to Grace. "Right now we're doing fine." Samara also admitted to the DPA that she did not want to see her husband get into trouble. She did not want to testify, but did only because she had been subpoenaed.

Under questioning by defense counsel, Samara testified that the reason she called the police was to tell them she was taking her husband's car. She was "frustrated" after the incident and wanted to go for a drive

with her daughter to cool off. She felt she had to inform the police because Grace would sometimes call the police and warn them she was not allowed to take his car. Grace would then tell Samara that the police would arrest her if she did. Samara claimed that when the police arrived that evening, they said she could take her husband's car, but warned her that " 'it's under his name.' "

Under questioning by the family court, Samara remembered that her frustration with the situation also stemmed from an incident earlier that day in which Grace was yelling at her from their apartment lanai, to "get upstairs." She also clarified that she did not take her husband's car after all, for fear of getting arrested for doing so without his permission.

Hawai'i County Police Officer Lorenzo Artienda (Officer Artienda) testified next. He remembered overhearing a dispatch to the scene and going there to help out. Officer Artienda went because he had gone there earlier that day and was "familiar with the people involved." At the park, Officer Artienda spoke with Samara, who had several children with her. She seemed a "little bit" upset. She did not mention medications. Officer Artienda related: "Um, she initially stated that, um, [Grace] took the cell phone and that, um, he had scratched her on her wrist and punched her or whacked her." Officer Artienda did not see any injuries on Samara, but added that injuries are not always visible in abuse cases. Leaving the witness interviews to another police officer, Officer Artienda went to speak with Grace in the apartment. Grace told Officer Artienda that "it was his phone and he was gonna retrieve the phone."

Officer Artienda arrested Grace and took him to the police station. There, Officer Artienda advised Grace of his rights and took a statement from him. Grace denied hitting Samara, and told Officer Artienda that "if he did hit her I would be able to see it or the injuries." Officer Artienda confirmed that Grace was calm and "real cooperative." Offi-

---

**4.** The transcript of the trial indicates that the other children at the park with Samara Grace may have belonged to "friends that have kids the same age as my daughter."

cer Artienda did not notice whether Grace had been drinking.

Hawai'i County Police Officer Stacy Leialoha (Officer Leialoha) arrived about five minutes after hearing the dispatch to the scene, and was told by Officer Artienda to assist in investigating the case. She interviewed "two young girls, uh, who are, um, witnesses to the incident." Officer Leialoha did not identify one of the girls and did not fully identify the other. When the DPA asked Officer Leialoha what she had learned from the interviews, defense counsel made a hearsay objection. The family court asked whether the DPA could cite any hearsay exception. The DPA cited "present-sense impression." Opining that the proffered exception usually applies only to an overheard remark, "made while the declarant was perceiving the event or condition or immediately thereafter[,]" Hawaii Rules of Evidence (HRE) Rule 803(b)(1) (1993), the family court suggested instead that the interviews might come in as "excited utterances," or statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." HRE Rule 803(b)(2) (1993). The family court allowed the DPA to further question Officer Leialoha, "to determine whether or not they were, uh, under the stress of the excitement at the time[.]"

Under further questioning by the DPA, Officer Leialoha recalled that the two girls were ages ten and eleven, but she could not remember which was which. When asked about the girls' "emotional state," Officer Leialoha replied, "Um, they seemed somewhat excited because, um, police were there, in my opinion, and, um, they seen what happened so they were anxious to tell what they saw." Officer Leialoha observed that the girls were "nervous looking." The girls' hands were fidgeting and they were quick to get their stories out, "as if they were nervous." The girls were not crying. When the DPA asked whether the girls were upset, Officer Leialoha answered, "Um, not really." On *voir dire*, Officer Leialoha confirmed that the girls did not come running to her when she arrived on the scene. The family court ultimately decided that the girls' statements were indeed "excited utterances."

On that basis, Officer Leialoha testified that the girls told her they had witnessed the cell phone incident and had seen Grace hit Samara "on her body." One of the girls—whom Officer Leialoha identified only as "Leopoldino"—told Officer Leialoha that "she saw Mr. Grace hit Mrs. Grace two times on the shoulder and, uh, scratched her left arm." On cross-examination, Officer Leialoha remembered that the girls told her they were with Samara "under the big tree in the grass near, um, near the river" when the incident happened. The girls said they were talking to each other at the time.

After the State rested, defense counsel moved for a judgment of acquittal. Besides arguing insufficiency of the evidence in a couple of respects, defense counsel averred that the admission of the girls' statements violated Grace's confrontation clause rights. The family court denied the motion.

Grace was the only witness in his defense. He remembered that two of his friends—Ann Lewis and a man named Dennis whose lengthy last name he could not pronounce—were visiting him in the apartment that day. His friends were drinking beer, but Grace claimed that he himself was not. Grace could see Samara in the park from the lanai of his upstairs apartment. At some point in the day, Grace called over to Samara from the lanai and asked her to come back home to cook. Samara indicated that she was going to return after a little while. Grace's two friends left in the early evening. When Grace walked them downstairs, he decided he might as well go and get his cell phone back from Samara. He was worried she might be running up an intolerable long distance bill.

According to Grace, no one was sitting near Samara in the park, except for an old lady he did not really know. When Grace got to where Samara was sitting, he asked her for his cell phone. Grace reached over and got the phone from her without incident and walked back to the apartment. When the police arrived ten or fifteen minutes later and arrested him, Grace was bewildered—"I asked, 'For what?' " Grace denied scratching

Samara when he took the phone from her. Grace also denied touching or hitting her in any way.

On cross-examination, Grace maintained that he drinks only on occasion because he takes "narcotic medication." He again denied drinking that day. He explained that the odor of alcohol Samara detected came from beer he had spilled on himself. He was getting a can of beer from the refrigerator for his friends, but when he opened the can, "It blowed up on me." Grace denied seeing two little girls with Samara in the park that day. Grace remembered that the police had come to the apartment earlier that day to help him, because he had locked himself inescapably in the apartment. Grace denied that the police came that first time because he was fighting with his wife. "No. She—she wasn't even there."

The family court decided as follows:

Okay. All right. The, uh, Court's reviewed its note[s] and has refreshed its recollection regarding the, um, testimony previously given, and the court is gonna find based upon the evidence, uh, that has established beyond a reasonable doubt the following:

That, um, on July 31st, 2002, in the City of Hilo, County and State of Hawai'i, um, defendant, uh, Ernest Grace did recklessly and knowingly, uh, physically abuse his wife [Samara] Grace by scratching and punching her, and—and as such, uh, defendant is—is, uh, found to be guilty of the offense of Abuse of a Family or Household Member and that the event occurred near the, uh, park located adjacent to the Cafe 100 Restaurant.

In reaching this conclusion the Court, uh, is aware of the testimony of the victim [Samara] Grace.

Um, Miss Grace indicated that she was under the influence of medication the day of the assault, and, therefore, her memory of the events was not accurate, uh, when she spoke to the police and, uh, and that her memory of the events at the time of the trial [was] more accurate. And she related at that time that defendant did not strike her but merely grabbed at her

phone and in the process, uh, scratched her.

Uh, Court finds . . . the victim's recantation, uh, to be not credible. Uh, obviously if she was under the influence of medication which affected her memory at the time of the alleged offense, uh, that memory would not improve after the fact.

All right. It's either she was under the influence so she couldn't remember what happened, uh, but, uh, I don't know how her memory would be reinstated once the medication wore off. Um, so I find that it—her story of—with respect to the events subsequent to that day, uh, not to be credible.

Um, stating it another way if defendant's [sic] memory was flawed because of the medication we would expect that, uh anything that occurred while she was under the influence, uh, is something that she would not remember.

Instead we find a victim who was capable of giving a statement to the police of what the defendant did to her on that day, and had the medication affected the victim's memory at the time of the offense we would not expect the victim to remember anything that happened.

Uh, if anything were to be true it would be more likely that the victim's current memory of the events is not as accurate as her memory of what happened at the time of the incident.

As such the Court gives no weight to the victim's testimony during trial but relies solely upon what the victim stated to police at the time of the victim's—excuse me, at the time of the defendant's attack on her, and this reliance is, uh, bolstered by the testimony of the two girls who witnessed the attacks and corroborated the victim's statement to the police.

This would be Silhouette, and, uh, I forget the name of the other girl. Um, but they were there. Uh, they said they witnessed the event. Uh, they were still under the excitement of the event, uh, some five minutes later when the police arrived and obviously appeared, uh, in the, um, words of the officer, agitated and upset and excited.

So the, um, testimony of the girls, uh, the Court deems to be reliable, um, and to be consistent with the testimony given by the victim; i.e., that the two girls were, in fact, present at the time, uh, that she was struck by the defendant who punched her.

Uh, the two girls both related that the victim, uh, was punched in the shoulder and the, uh, head, I believe, um, by the defendant.

Um, the entire, uh, scenario is also consistent with the, um, testimony by the victim that at the time that this event occurred that—that Mr. Grace was drunk.

All right. Uh, that will be consistent with the smell of alcohol on him and, uh, would explain his behavior 'cause she said that he yelled at her from the balcony and came down to her.

This would also explain the fact that the police were called to the, uh, residence of the parties previously that day.

Okay. Given all of the, uh, evidence, uh, that has been produced the Court finds that all of the evidence, uh, is consistent with the position alleged by the prosecution and appears to be inconsistent with the statements made by the defendant.

So the Court finds that the State has proved beyond a reasonable doubt that the victim was abused and that the abuse occurred, uh, because of the defendant's, uh, punching and scratching of the [victim].

With respect to the issue of maltreatment the Court notes that, um, um, the proof that the victim was hurt, um, or to make it more—physically abused, that the victim was maltreated in such a manner as to cause injury, hurt, or damage to the person's body, um, the Court finds that, uh, this can be imputed by the, uh, fact that the victim was punched and suffered an—an abrasion to the body that is a scratching of the bod party [sic], and that, in and of itself, I think, is sufficient, uh, proof that the victim was, um, maltreated.

All right. With respect to the intent the Court notes that the Court can, um, that in these kinds of cases it is rarely, um, possible to prove what the state of mind of the defendant was, uh, through testimony that the defendant himself gave. Instead the Court notes that these, um, states of mind can be implied from all of the circumstances, um, surrounding the case in this particular instance.

Um, in order to inflict injury upon the victim Mr. Grace must have had, um, some knowledge that if he raised his hand, quote, uh, put it in a fist and—advanced that towards the victim, that that would be, uh, sufficient, uh, proof that the did so at least with a reckless state of mind or that he did so knowingly. As such Court finds that the State has sustained its burden of proof.

(Some brackets in the original.)

## II. The Issues Presented.

Grace stakes out two points of error on appeal:

1. The trial court erred in failing to require reliable foundation for the hearsay statements of the "two girls," in ruling that the statements constituted admissible "excited utterances," and by admitting the statements in violation of [Grace's] constitutional rights of confrontation and cross-examination.

. . . .

2. The trial court erred in denying [Grace's] motion for judgment of acquittal because there was insufficient evidence to establish that [Grace] physically abused [Samara], in violation of HRS § 709–906(1), or that he caused any purported injuries with the requisite state of mind.

Opening Brief at 8–12 (bolding omitted).

On point 1, we need not reach all of the issues Grace raises thereunder, because we conclude the admission of the statements of the two girls violated his rights under the confrontation clause of the Sixth Amendment to the United States Constitution, as those rights now stand transfigured by the United States Supreme Court in *Crawford, supra.*

## III. Standards of Review.

*A.* *The Sixth Amendment Confrontation Clause.*

██ "We answer questions of constitutional law by exercising our own independent

judgment based on the facts of the case, and, thus, questions of constitutional law are reviewed on appeal under the right/wrong standard." *State v. Rivera*, 106 Hawai'i 146, 155, 102 P.3d 1044, 1053 (2004) (citations, internal quotation marks and block quote format omitted).

> We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy v. State of Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 [ (1963) ]. There we said: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.*, at 86–87, 84 S.Ct. at 230.... We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.

*Chapman v. California*, 386 U.S. 18, 23–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See also Crawford*, 124 S.Ct. at 1359 n. 1 (noting, without reaching the question, that the Washington Court of Appeals below had concluded "that the confrontation violation, if it occurred, was not harmless"). *Cf. State v. Peseti*, 101 Hawai'i 172, 178, 65 P.3d 119, 125 (2003):

> A violation of the constitutional right to confront adverse witnesses is subject to the harmless-beyond-a-reasonable-doubt standard. In applying the harmless-beyond-a-reasonable-doubt standard, the

court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction. Mere sufficiency of the evidence to support the jury verdict, apart from that aspect of the case affected by the error, would not be enough.

(Brackets, parenthetical, citations, internal quotation marks and block quote format omitted.) [5]

### B. *Sufficiency of the Evidence.*

The standard of review for sufficiency of the evidence is well established;

> namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. Sufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged. Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.

*State v. Ferrer*, 95 Hawai'i 409, 422, 23 P.3d 744, 757 (App.2001) (citation and block quote format omitted).

---

5. *See Chapman v. California*, 386 U.S. 18, 20–21, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967):

> Before deciding the two questions here—whether there can ever be harmless constitutional error and whether the error here was harmless—we must first decide whether state or federal law governs. The application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law. But the error from which these petitioners suffered was a denial of rights guaranteed against invasion by the Fifth and Fourteenth Amendments, rights rooted in the Bill of Rights, offered and championed in the Congress by James Madison, who told the Congress that the 'independent' federal courts would be the 'guardians of those rights.' Whether a conviction for crime should stand when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied. With faithfulness to the constitutional union of the States, we cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people from infractions by the States of federally guaranteed rights. We have no hesitation in saying that the right of these petitioners not to be punished for exercising their Fifth and Fourteenth Amendment right to be silent—expressly created by the Federal Constitution itself—is a federal right which, in the absence of appropriate congressional action, it is our responsibility to protect by fashioning the necessary rule.
> (Footnotes omitted.)

## IV. Discussion.

### A. The Sixth Amendment Confrontation Clause.

■ On March 8, 2004, the United States Supreme Court handed down the seminal *Crawford* decision, fundamentally altering nearly a quarter century of confrontation clause jurisprudence.[6] In that case, Michael D. Crawford appealed his conviction of assault. At issue was a tape recording of a custodial police interrogation of his wife, Sylvia, who at the time was still a potential suspect, which the prosecution played for the jury to refute Crawford's claim of self-defense. Sylvia was unavailable to testify at trial because Crawford had invoked the spousal privilege. *Crawford*, 124 S.Ct. at 1356–59, 1372. The Supreme Court granted *certiorari* "to determine whether the State's use of Sylvia's statement violated the Confrontation Clause." *Id.* at 1359 (citation omitted).

Before *Crawford*, an unavailable[7] hearsay declarant's testimony was deemed admissible in the face of the Sixth Amendment's confrontation clause if it bore adequate indicia of reliability, by either (1) falling within a firmly rooted hearsay exception, or (2) demonstrating particularized guarantees of trustworthiness:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (footnote omitted). *Cf. State v. Moore,* 82 Hawai'i 202, 222–24, 921 P.2d 122, 142–44 (1996) (adopting

---

**6.** Ernest L. Grace, Sr. (Grace) filed his opening brief on February 5, 2004 and hence, did not cite *Crawford v. Washington,* 541 U.S. 36; 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (decided March 8, 2004), in support of his confrontation clause arguments. However, on June 1, 2004, Grace filed his reply brief, which argued *Crawford* extensively on the confrontation clause issue. We will apply *Crawford* here. *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) ("We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.").

**7.** The basic litmus of Sixth Amendment unavailability is established: "[A] witness is not 'unavailable' for purposes of the ... exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial." *Barber v. Page,* 390 U.S. [719,] 724–725, 88 S.Ct.[1318,] 1322[, 20 L.Ed.2d 255 (1968)] (emphasis added). Accord, *Mancusi v. Stubbs,* [408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972)]; *California v. Green,* 399 U.S.[149,] 161–162, 165, 167, n. 16, 90 S.Ct.[1930,] 1936–1937, 1938–1939, n. 16[, 26 L.Ed.2d 489 (1970)]; *Berger v. California,* 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969).

Although it might be said that the Court's prior cases provide no further refinement of this statement of the rule, certain general propositions safely emerge. The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation. "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." *California v. Green,* 399 U.S., at 189, n. 22, 90 S.Ct., at 1951 (concurring opinion, citing *Barber v. Page, supra* ). The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate. *Ohio v. Roberts,* 448 U.S. 56, 74–75, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *Cf. State v. Moore,* 82 Hawai'i 202, 223, 921 P.2d 122, 143 (1996) (adopting the *Roberts* reliability rule for purposes of the virtually identical confrontation clause contained in article I, section 14 of the Hawai'i Constitution):

> To demonstrate the unavailability of a declarant at trial, the prosecution must show that it made a good faith attempt to secure his or her presence. To establish this good faith attempt, the prosecution must confirm on the record at the time of trial both the declarant's unavailability and that vigorous and appropriate steps were taken to procure the declarant's presence at trial.

(Citation and block quote format omitted.)

the *Roberts* rule for purposes of the virtually identical confrontation clause contained in article I, section 14 of the Hawai'i Constitution); *with State v. Sua*, 92 Hawai'i 61, 70–76, 987 P.2d 959, 968–74 (1999) (confirming Hawai'i's adoption of the *Roberts* rule, but apparently applying the two prongs of the *Roberts* reliability rubric conjunctively rather than disjunctively, in order "to ensure the highest standard of protection of Sua's constitutional right of confrontation" (footnote omitted)).

Effecting a sea change in our understanding of the confrontation clause, the Supreme Court in *Crawford* eschewed the *Roberts* rule of reliability for one of process: "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 124 S.Ct. at 1370. More pithily stated: "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Crawford*, 124 S.Ct. at 1371.

Citing exhaustively to historical evidence and common law sources, the *Crawford* Court drew two inferences about what the Framers meant by the confrontation clause. "First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 1363. Confirming that the primary concern of the Framers of the confrontation clause was just such "testimonial" statements, *id.* at 1364–65, the *Crawford* Court went on to hold: "The historical record also supports a second proposition: that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 1365. Ultimately reversing and remanding, the Supreme Court summed it all up:

Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

In this case, the State admitted Sylvia's testimonial statement against petitioner, despite the fact that he had no opportunity to cross-examine her. That alone is sufficient to make out a violation of the Sixth Amendment. *Roberts* notwithstanding, we decline to mine the record in search of indicia of reliability. Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation . . . .

*Id.* at 1374 (footnote omitted).

█ Because federal constitutional guarantees are the absolute minimum constitutional protections we must afford criminal defendants, *see, e.g., Sua*, 92 Hawai'i at 73 n. 8, 987 P.2d at 971 n. 8 ("this court will not hesitate to extend the protections of the Hawai'i Constitution beyond federal standards" (citations omitted)), we may end our error inquiry without more if the family court prejudicially offended the Sixth Amendment confrontation clause. In this regard, Grace contends the family court committed *Crawford* error by admitting the girls' statements because they were testimonial hearsay, and the girls were neither unavailable nor subject at any time to his cross-examination concerning their statements.

We have no problem with Grace's latter proposition, as it is obvious that neither conjunct was fulfilled. Grace had no prior opportunity to cross-examine the girls about their out-of-court statements. And the State concedes, and upon a review of the record we confirm,[8] that the State made no effort whatsoever below to procure the girls' presence at Grace's trial. *Crawford,* 124 S.Ct. at 1374. The nicer question is whether the girls' statements at all lie within the new and apparently exclusive purview of the Sixth Amendment's confrontation clause brought into focus by *Crawford;* in other words, whether their hearsay statements were "testimonial." *Id.*

*Crawford* leaves us in a bit of a quandary here, for as quoted above, the Supreme Court did not attempt a comprehensive definition of the core term "testimonial," *id.* at 1374, being content to leave us mere sibylline suggestion instead:

> This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.
>
> The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused—in other words, those who "bear testimony." 1 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or

affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

> Various formulations of this core class of "testimonial" statements exist: *"ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois,* 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (THOMAS, J., joined by SCALIA, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers [NACDL] *et al.* as *Amici Curiae* 3. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing.

**8.** In *State v. Hoang,* 93 Hawai'i 333, 3 P.3d 499 (2000), the supreme court explained our duty where the State concedes error:

> An appellant's burden of demonstrating error in the record is consistent with Hawaii's case law and court rules. In "confession of error" cases where the prosecution "admits" to error, *see State v. Wasson,* 76 Hawai'i 415, 418, 879 P.2d 520, 523 (1994); *Territory v. Kogami,* 37 Haw. 174, 175 (1945), this court has stated that, "even when the prosecutor concedes error, before a conviction is reversed, 'it is incumbent on the appellate court [first] to

ascertain ... that the confession of error is supported by the record and well-founded in law and [second] to determine that such error is properly preserved and prejudicial.' " *Wasson,* 76 Hawai'i at 418, 879 P.2d at 523 (quoting *Kogami,* 37 Haw. at 175). In other words, a confession of error by the prosecution "is not binding upon an appellate court, nor may a conviction be reversed on the strength of [the prosecutor's] official action alone." *Kogami,* 37 Haw. at 175.

*Hoang,* 93 Hawai'i at 336, 3 P.3d at 502 (brackets and ellipsis in the original).

Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard. Police interrogations bear a striking resemblance to examinations by justices of the peace in England. The statements are not *sworn* testimony, but the absence of oath was not dispositive. . . .

*Crawford,* 124 S.Ct. at 1364 (emphasis and some brackets in the original).

Seizing upon the NACDL formulation, *id.,* the California Court of Appeals in *People v. Sisavath,* 118 Cal.App.4th 1396, 13 Cal. Rptr.3d 753 (2004), a sexual assault case, held that "a videotaped interview [of a victim] with a trained interviewer at ... a facility specially designed and staffed for interviewing children suspected of being victims of abuse[,]" which interview was attended by an investigator from the district attorney's office and the deputy district attorney who prosecuted the case, *id.* at 756–57, was "testimonial" under *Crawford,* because it was " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *Id.* at 757 (some internal quotation marks omitted) (quoting *Crawford,* 124 S.Ct. at 1364).

Along the way, the California court noted the following conundrum:

Conceivably, the Supreme Court's reference to an "objective witness" should be taken to mean an objective witness in the same category of persons as the actual witness—here, an objective four-year-old. But we do not think so. It is more likely that the Supreme Court meant simply that if the statement was given under circumstances in which its use in a prosecution is reasonably foreseeable by an objective observer, then the statement is testimonial.

*Sisavath,* 13 Cal.Rptr.3d at 758 n. 3. Accordingly, the *Sisavath* court held, "The pertinent question is whether an objective observer would reasonably expect the statement to be *available for use* in a prosecution." *Id.* at 758 (emphasis in the original).

In this case, we, too, will use the NACDL formulation, but there may be no need to substitute the phrase "objective observer" for "objective witness" as the *Sisavath* court

did, for the latter phrase may just as easily be interpreted as a witness shorn of the vagaries of knowledge and personal characteristics, to the same effect. At any rate, based upon all of the surrounding circumstances, detailed in the background above, we decide that the girls' statements were "testimonial" under *Crawford,* as they were " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' Brief for National Association of Criminal Defense Lawyers *et al.* as *Amici Curiae* 3." *Crawford,* 124 S.Ct. at 1364. After all, as the font of the NACDL formulation argued, "Cases involving witness statements to law enforcement investigating the crime are thus the easy cases; cases involving these statements should yield maximum consistency and protection if the Confrontation Clause is operating properly." Brief of *Amici Curiae* National Association of Criminal Defense Lawyers *et al.,* at 8, *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (No. 02–9410).

Accordingly, we hold that the admission of the girls' statements violated Grace's right to confrontation under the Sixth Amendment to the United States Constitution. *Crawford,* 124 S.Ct. at 1374. This error was not harmless beyond a reasonable doubt, *Chapman,* 386 U.S. at 24, 87 S.Ct. 824, because the family court expressly relied upon the girls' statements to corroborate and bolster the reliability of Samara's statements to the police, upon which the family court ultimately based its decision to convict. Thus, "there is a reasonable possibility that the evidence complained of might have contributed to the conviction[,]" *Chapman,* 386 U.S. at 23, 87 S.Ct. 824 (citation and internal quotation marks omitted), and we must either reverse or vacate and remand. Which brings us to Grace's second point of error.

*B. Sufficiency of the Evidence.*

Upon and beyond our holding of *Crawford* error, we consider whether there was sufficient evidence adduced at trial to support Grace's conviction. "[C]hallenges to the sufficiency of the evidence must always

be decided on appeal. This is because the Double Jeopardy Clause bars retrial of a defendant once a reviewing court has found the evidence at trial to be legally insufficient to support a conviction." *State v. Malufau*, 80 Hawai'i 126, 132, 906 P.2d 612, 618 (1995) (citation and internal quotation marks omitted), *vacated in part on other grounds on reconsideration*, 80 Hawai'i 126, 134–38, 906 P.2d 612, 620–24 (1995).

On this point, Grace contends: "In the present case, the State did not present evidence of sufficient quality and probative value to establish that physical abuse occurred, that [Grace] caused the physical abuse, and that he did so with the requisite state of mind." Opening Brief at 22. Grace's subsidiary arguments essentially attack the credibility and weight of Samara's statements to the police, but exalt the same qualities in her testimony at trial. This invidious comparison, along with Grace's testimonial denials and the lack of physical evidence of injury, comprise the entire basis for Grace's second point of error. The point lacks merit.

The family court credited Samara's statements to the police over her testimony at trial. Likewise, the family court did not believe Grace's denials. This was the prerogative of the family court, upon which we may not tread. *State v. Ferrer*, 95 Hawai'i 409, 422, 23 P.3d 744, 757 (App.2001) ("we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact" (citation and block quote format omitted)). Samara's statements to the police, "viewed in the light most favorable to the prosecution[,]" were substantial evidence that Grace scratched and punched her. *Id.* (citation and block quote format omitted). As for the requisite *mens rea*, we cite *State v. Eastman*, 81 Hawai'i 131, 141, 913 P.2d 57, 67 (1996):

> Moreover, we have held that persons of ordinary intelligence would have a reasonable opportunity to know that causing physical injury by punching someone in the face would constitute physical abuse. *State v. Kameenui*, 69 Haw. 620, 623, 753 P.2d 1250, 1252 (1988). Absent a legal justification or excuse, a slap on the side of the head involves, at a minimum, a sub-

stantial and unjustifiable risk, i.e., "a gross deviation from the standard of conduct that a law-abiding person would observe in the same situation." HRS § 702–206(3)(d) (1993).

The same substantial evidence showing that Eastman slapped Bautista on the side of her head also supports a finding that, at a minimum, Eastman consciously disregarded a substantial and unjustifiable risk of physically abusing Bautista. Therefore, the prosecution provided substantial evidence from which the trial court could infer that Eastman physically abused Bautista with the minimum requisite state of mind, i.e., recklessness, for a conviction under HRS § 709–906(1).

We conclude there was substantial, and therefore sufficient, evidence to support Grace's conviction.

## V. Conclusion.

Accordingly, we vacate the family court's June 13, 2003 judgment and remand for a new trial.

